464 A.2d 1243

**Edmund J. DELAHANTY, Margaret A. Delahanty and Cascade Car Corporation, Appellees**

**v.**

**FIRST PENNSYLVANIA BANK, N.A., Appellant.**

Superior Court of Pennsylvania.

Argued May 3, 1982.

Filed July 15, 1983.

Reargument Denied Sept. 26, 1983.

Petition for Allowance of Appeal Granted Feb. 27, 1984.

92

94

98

100

Henry Ruth, Philadelphia, for appellant.

Leonard Schaeffer, Philadelphia, for appellees.

Before SPAETH, ROWLEY and CIRILLO, JJ.

CIRILLO, Judge:

This is an appeal from a judgment entered on a verdict for $70,000 compensatory damages and $750,000 punitive damages in favor of plaintiff/appellees and against defendant/appellant. The appellees involved in this suit are Edmund J. Delahanty (hereinafter "Delahanty"), his wife Margaret A. Delahanty, and Cascade Car Corporation (hereinafter "Cascade"). Cascade is a closely held Pennsylvania corporation formed by Delahanty and seven other shareholders in April 1973 to conduct an auto leasing business. Appellant is First Pennsylvania Bank (hereinafter "Bank"), a state chartered bank, which is a member of the Federal Reserve and a nationally chartered banking association. The Bank had financed appellee's used car business, Delahanty Auto Sales (hereinafter "Auto Sales"), and new leasing business, Cascade. Appellees alleged and, in the view of the trial judge, proved that fraudulent misrepresentations by Bank officials had caused the destruction of their existing used car business and new leasing business.

In August 1976, appellees commenced an action in trespass alleging fraud against the Bank. Appellees alleged that the Bank had fraudulently induced them to enter into the auto leasing business and subsequently caused the destruction of that business and its used car business by refusing to extend further financing, calling the loans previously extended, repossessing the cars in inventory and commencing its own competing automobile leasing business, "LEASEIT". The Bank denied liability to appellees and filed a counter-claim for debts due on promissory and demand notes made and guaranteed by appellees.

Appellant asserts on appeal that 1) the trial court erred as a matter of law in finding that the Bank engaged in fraudulent conduct; 2) the trial court erred in awarding

Delahanty "anticipated lost profits" as part of compensatory damages; 3) the award of punitive damages was both improper and excessive and must be stricken; and 4) the trial court erred in entering judgment against the Bank on its counterclaims. For the reasons which follow, we reduce the amount of compensatory damages from $70,000 to $40,000 and the punitive damages from $750,000 to $440,-000. We affirm the lower court's finding of fraud but partially reverse the judgment against the Bank on its counterclaims.

A narration of the factual background of this appeal begins with Delahanty, in September 1972, investigating the prospect of automobile leasing directed at blue and white collar individual consumers, that portion of the general public who normally purchase automobiles. Delahanty, with twenty-five years of experience in the automobile business, including ownership of Auto Sales for the past six years, noticed several changes in the retail and leasing business which spurred his interest in this marketing concept. Delahanty's extensive research supported the conclusion that there was a market in the blue and white collar worker which had never been tapped by the leasing industry. Up to this time, leasing had primarily been offered to two distinct markets, Commercial and Professional. Commercial leasing consisted mainly of large fleets of cars available to corporations. Professional leasing was directed at the higher income bracket professionals who could use the leasing of a luxury car as a tax deduction.

Delahanty's unique and novel method of leasing automobiles included the tapping of a new market, an on-site inventory to choose from and an immediate profit to the automobile dealer. Under prior leasing business practice, the dealer would finance the lease and would not realize a profit until the end of the lease when the automobile would be sold. Additionally, the dealer was responsible for the collection of the monthly payments on the lease. Delahanty's plan called for the bank, or financial institution supplying the loan for the floor plan, to purchase and receive an

assignment of the lease at the outset, thus producing an immediate profit for the automobile dealer. Furthermore, the bank would be responsible for the collection of the monthly payments, which it was in a much better position to handle considering its structure and access to credit personnel.

In January 1973, pursuant to his exhaustive research, Delahanty prepared a document entitled "Financial Aspects of the Personal Leasing Industry". Delahanty had several preliminary discussions with various officers of the Bank, including John Kearney (hereinafter "Kearney"), Vice-President in charge of the Bank's Installment Loan Department, John Plumley (hereinafter "Plumley"), Administrator of the Installment Loan Department, and Mr. Tulskie (hereinafter "Tulskie"), Dealer Representative of the Installment Loan Department, to see if the Bank would be interested in financing his plan through capital and operating loans. Delahanty's relationship with the Bank began in 1971 when it provided financing for Auto Sales through a capital loan and floor plan line of credit. Delahanty had previously dealt with Kearney and Plumley, who was under Kearney's supervision. When Delahanty explained his proposal, Kearney expressed an interest in the concept and felt that it was a unique method for leasing automobiles. Accordingly, a number of meetings followed between Delahanty and various members of the Bank to discuss the venture.

In February 1973, an initial meeting was held at the Bank's offices at 30th and Market Streets. Delahanty presented the financial pamphlet to the Bank officials in attendance—Plumley, Tulskie, Len Becci (hereinafter "Becci"), Credit Supervisor of the Installment Loan Department, and Mr. Hennion, Sales Manager of Auto Sales for the Installment Loan Department. All of these officials were under Kearney's supervision and reported to him.

Later in February 1973, a second meeting was scheduled with Delahanty, Plumley and Tulskie, which was held at a restaurant in Delaware. Delahanty presented a second publication, "Marketing," in which he elaborated on the

implementation and marketing of his leasing proposal. The Bank officials were impressed and expressed the belief that the marketing department of the Bank would most certainly be interested in his ideas.

In late February/early March 1973, a third meeting was held at the Bank's offices at 30th and Market Streets. It was attended by Delahanty, Plumley and Becci. In addition, Frank Dynan (hereinafter "Dynan"), Assistant of the Bank's Marketing and Services Department, was present. At this meeting, a third pamphlet, "Philosophy," was presented and Delahanty made his pitch to secure financing from the Bank for the leasing corporation. At the end of the meeting, Plumley told Delahanty that the Bank was interested in "backing your company" and not interested "in being in the leasing business" itself.

In March 1973, Delahanty met with Plumley and Kearney to obtain additional capital for Auto Sales. An additional $27,000 was granted bringing Auto Sales capital loan to $50,000.

A final meeting was held in April 1973, and Delahanty and his accountant, Mr. Rosenberg, presented a Pro Forma Report, to Kearney, Plumley and Becci, which set forth the final details of the new leasing business. No documents were signed at this meeting, but it was agreed that Delahanty would sign personally for a $50,000 loan for base capitalization, obtain credit from the Bank for the individual lease financing and obtain $300,000 for a floor plan line of credit. The original proposal, submitted by Delahanty, required a $150,000 line of credit.

At this final meeting, Kearney insisted that Delahanty commence business in the spring of 1973. Delahanty objected and stated that he wanted to start in the Fall of 1973 because he would benefit from the new car announcements and less inventory would be needed due to the 4–6 weeks availability on new car orders. Delahanty felt that starting in the Spring presented problems because it was the end of the 1973 model year which meant that by the end of the summer there might be an inadequate supply of cars and to

prevent that problem he would be forced to begin with a larger inventory. Relying on Kearney's representations of the Bank's support, "What are you worried about? Look at the money we are putting behind it" Delahanty reluctantly agreed to commence business in the spring, fearing he would lose the opportunity if he did not follow Kearney's suggestion. In late April/early May 1973, Cascade was formed and entered a lease agreement for property in the Drexeline Shopping Center. On May 17, 1973, Cascade opened its doors for business.

On June 6, 1973, Plumley and Ed Bove (hereinafter "Bove"), Operations Officer of the Installment Loan Department, invited Delahanty to play golf and informed him, at that time, that the Bank had decided to enter the leasing business itself. Delahanty expressed deep concern, but Plumley told him not to worry that the Bank "was not going to do anything to hurt him." The following day, June 7th, Delahanty signed the master contracts with the Bank for the lease financing. All of the loans extended were personally guaranteed by Delahanty and his wife.

Though Cascade had ordered 300 cars in April 1973, it only received 135. Of those cars received, Cascade leased a total of 42 between May and December 1973 (breakdown of the number of leases signed: June—9, July—13, August—5, September—3, October—8, and November—4). In July/August 1973, Delahanty sent a letter to Kearney requesting additional operating capital for Cascade. Delahanty's payments on all of the loans, both Auto Sales' and Cascade's, were paid to date until September 1973. In September/October 1973, Delahanty had a meeting with Kearney and Plumley and presented financial statements on both businesses to support his earlier request for additional working capital. In November 1973, after refusing to extend his financing, Plumley requested that Delahanty voluntarily surrender all cars in inventory of both businesses. Plumley admitted that the loans were not called because they were in default, but due to the fact that the Bank felt that Cascade had not leased enough cars. All cars were

surrendered at the end of December 1973. Plumley sold the cars through word of mouth to employees of the Bank and individual dealers, rather than at public auction. A public offering would have insured that the highest possible figure would be received for the cars, so as to mitigate the amount of damages. Delahanty was never given notice of the manner in which the inventory was sold or a list of the individual prices received for each car.

During the extensive negotiations between Delahanty and the Bank, no disclosure was made of the Bank's intentions to enter the leasing business on its own, despite the fact that it had been investigating the possibility since 1969. In 1969, Dynan, who was then in the Bank's Installment Loan Department, began an inquiry into the auto leasing business to determine the feasibility of the Bank entering the field. As early as August 5, 1971, Dynan authored a memorandum to his superior, Charles Shanahan (hereinafter "Shanahan"), Chief Administrator of the Installment Loan Department, which gave a comprehensive overview of the automobile leasing industry and the difficulties the Bank would encounter in entering the field. The memo mentioned that Kearney had advised Dynan that the independent automobile dealers would initially be upset by the Bank's entry into the business. It also recommended that Plumley, who had many years of experience in auto financing, be considered in centralizing control over the Bank's auto leasing project. In May 1972, Shanahan directed Dynan to ask the rest of the Installment Loan Department what they thought of the auto leasing idea. On May 15, 1972, a second memorandum by Dynan to Shanahan confirmed Kearney's active involvement with Shanahan and Becci in developing the auto leasing idea. In August 1972, Shanahan and Dynan were transferred to the Marketing Department, and Kearney later became Vice-President in charge of the Installment Loan Department.

On April 10, 1973, Shanahan received a letter from First National Leasing Systems (hereinafter "NLS"), offering their computer services in setting up the Bank's leasing

business. Shanahan sent this letter to Dynan, requesting that he look into the matter immediately. On May 5, 1973, Dynan, Plumley and Bove went to California to meet with NLS. On June 6, 1973, Plumley and Bove advised Delahanty of the Bank's decision to enter auto leasing itself, though the official decision was allegedly not made until July 30, 1973. Dynan, Plumley and Becci decided that a committee should be formed to handle the auto leasing project. Dynan was made the project manager, and the committee included Bove, Bob Vandergrift, officer in the Installment Loan Department, and George Martirosan, a computer expert in the Bank. In November 1973, the Bank signed an agreement with NLS. From September to December 1973, the Bank held seminars with dealers concerning their new business. On December 14, 1973, a press release announced the formation of "LEASEIT" by the Bank. On January 21, 1974, the Bank opened its indirect auto leasing business. On April 1, 1974, the Bank opened its direct auto leasing business.

*Fraud*

Before considering appellant's first contention, we note that fraud can take many forms. The courts should be quick to look for fraud, but not as quick to declare it. *Edelson v. Bernstein*, 382 Pa. 392, 115 A.2d 382, 384 (1955). Fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. *Frowen v. Blank*, 493 Pa. 137, 425 A.2d 412 (1981). It has been said that fraud may induce a person to assent to something which he would not otherwise have done, or it may induce him to believe that the act which he does is something other than it actually is. *Greenwood v. Kadoich*, 239 Pa.Super. 372, 357 A.2d 604 (1976). To be actionable, the misrepresentation need not be in the form of a positive assertion. *Shane v. Hoffman*, 227 Pa.Super. 176, 324 A.2d 532 (1974). It is any artifice by which a person is deceived to his disadvantage. *McClellan's Estate*, 365 Pa.

401, 75 A.2d 595 (1950). It may be by false or misleading allegations or by concealment of that which should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment. *Baker v. Rangos,* 229 Pa.Super. 333, 324 A.2d 498 (1974). It is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false. *Warren Balderston Co. v. Integrity Trust Co.,* 314 Pa. 58, 170 A. 282 (1934). It has also been established that "the deliberate nondisclosure of a material fact amounts to a culpable misrepresentation no less than does an intentional affirmation of a material falsity." *Neuman v. Corn Exchange National Bank & Trust Co.,* 356 Pa. 442, 450–52, 51 A.2d 759, 764 (1947). Yet, a misrepresentation innocently made is also actionable if it relates to a matter material to the transaction involved; while if the misrepresentation is made knowingly or involves a non-privileged failure to disclose, materiality is not a requisite to the action. *Shane v. Hoffmann,* 227 Pa.Super. 176, 324 A.2d 532 (1974). A misrepresentation is material when it is of such a character that if it had not been made, the transaction would not have been entered into. *Greenwood,* 239 Pa.Super. at 378, 357 A.2d at 607. One deceived need not prove that fraudulent misrepresentation was the sole inducement to the investment of money, a material inducement is sufficient. *Neuman* 356 Pa. at 454, 51 A.2d at 765.

██ The elements of fraud are as follows: " 'there must be (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result.' " *Scaife Co. v. Rockwell-Standard Corp.,* 446 Pa. 280, 285, 285 A.2d 451, 454 (1971), *cert. denied,* 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806, *quoting Neuman,* 356 Pa. at 442, 51 A.2d at 763; *See e.g. Edelson v. Bernstein,* 382 Pa. 392, 115 A.2d 382 (1955); *Gerfin v. Colonial Smelting & Refining co.,* 374 Pa. 66, 97

A.2d 71 (1953); *Shane v. Hoffman*, 227 Pa.Super. 176, 324 A.2d 532 (1974); *Laughlin v. McConnel*, 201 Pa.Super. 180, 191 A.2d 921 (1963).

One of the primary issues of this appeal by the Bank is whether there is sufficient evidence of fraudulent misrepresentation to justify 1) the judge's refusal to grant the Bank's motion for a non-suit and concluding, as a matter of law, that the evidence met the standard required to support submission of the case to the fact-finder, and 2) the judge's finding, sitting as the trier of fact, of fraud. Of course, if the evidence does not establish the Bank's liability, we need not reach the issue presented concerning the amount of damages awarded.

Initially, we will consider whether the trial court erred in denying the Bank's motion for a non-suit at the conclusion of appellees' case, allowing it to proceed.

In determining what burden Pennsylvania law places on those attempting to prove fraud, the Third Circuit Court of Appeals recently found in *Beardshall v. Minuteman Press International, Inc.*, 664 F.2d 23, 26 (3rd Cir.1981) that:

> In a recent decision the Supreme Court of Pennsylvania held that fraud or intent to defraud must be proved by " 'evidence that is clear, precise and convincing.' " *Snell v. Pennsylvania*, 490 Pa. 277, 281, 416 A.2d 468, 470 (1980) (citations omitted). In earlier cases the terminology varied. For example, in *Gerfin v. Colonial Smelting & Refining Co.*, 374 Pa. 66, 73, 97 A.2d 71, 74 (1953), two formulations for the burden of proof were used, "clear and convincing or ... clear, precise and indubitable." Whatever the formulation, it is evident that under Pennsylvania law fraud must be proved by a higher standard than the preponderance of the evidence standard ...

The Court went on to note:

> ... Plaintiffs misread the cases they cite.[4] [*Highmont Music Corp. v. J.M. Hoffman Co.*, 397 Pa. 345, 155 A.2d 363, 366 (1959); *Gerfin, supra; Greenwood v. Kadoich*, 239 Pa.Super. 372, 375, 357 A.2d 604, 606 (1976). *Edelstein v. Carole House Apartments, Inc.*, 220 Pa.Super.

298, 303, 286 A.2d 658, 661 (1971)] Those cases stand only for the proposition that the trial judge must decide as a matter of law before he submits a case to the jury whether plaintiffs' evidence attempting to prove fraud is sufficiently clear, precise and convincing to make out a prima facie case; they do not hold that once that burden is met, the jury may apply a lesser standard of proof in determining which evidence is true. Thus, if the trial judge determines there is sufficient evidence from which the jury could reasonably find that the plaintiffs have proven fraud according to this standard of proof, the judge may submit the case to the jury. " 'Whether the evidence is true is a question of fact ... but whether it meets the required standard which justifies its submission to the jury ... is always a question of law ...' " *Aliquippa National Bank ex rel. Woodlawn Trust Co. v. Harvey*, 340 Pa. 223, 231, 16 A.2d 409, 414 (1940), *quoted in Gerfin v. Colonial Smelting & Refining Co.*, 374 Pa. 66, 68, 97 A.2d 71, 72 (1953); *M.H. Davis Estate Oil Co., v. Sure Way Oil Co.*, 266 Pa.Super. 64, 68, 403 A.2d 95, 97 (1979).

■ Thus, in cases where fraud is the basis of the claim, the initial inquiry for the judge is whether the proof of every element of fraud has met the exacting standard, justifying a refusal to grant a non-suit and its submission to the fact-finder. What the standard requires was addressed in *Gerfin*, 374 Pa. at 72, 97 A.2d at 74, *quoting Stafford v. Reed*, 363 Pa. 405, 407, 410–11, 70 A.2d 345, 346 (1949):

What is meant by the statement that the evidence must be clear, precise and indubitable? It means that the witnesses must be 'credible, ... distinctly remember the facts to which they testify, and narrate the details exactly', that the evidence 'is not only found to be credible, but of such weight and directness as to make out the facts alleged beyond a reasonable doubt'; that 'the witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimo-

ny is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction without hesitancy, of the truth of the precise facts in issue.' (citations omitted)

*Accord: Edelstein,* 220 Pa.Super. at 303, 286 A.2d at 661.

■ Of course, it must be remembered that fraud can be established by the evidence of a single witness and there is no necessity that it be proven by the testimony of two witnesses, or by that of one witness, with corroborating circumstances. *City of Pittsburgh v. Ihrig,* 256 Pa. 410, 100 A. 957 (1917).

■ In reviewing the propriety of the lower court's actions in refusing to grant a non-suit, we must employ the test set forth in *O'Callaghan v. Weitzman,* 291 Pa.Super. 471, 473, 436 A.2d 212, 214 (1981):

... we note that a nonsuit may only be entered where the facts and circumstances lead unerringly to but one conclusion. "It is hornbook law that a judgment of nonsuit can be entered only in clear cases and before it may be entered the plaintiff must be given the benefit of all reasonable inferences of fact arising therefrom; and all conflicts in the evidence must be resolved in its favor." (citations omitted)

■ Reviewing the record in the above light, we find that Delahanty's testimony concerning the elements of fraud is brief, clear and direct. He testified that he was assured by the Bank officials that the Bank was behind him 100 percent and that the Bank had no interest in entering the leasing business itself. Delahanty was never informed of the Bank's intentions to run a competing company until after he had started his own. The purpose of the representations and non-disclosures was to induce Delahanty to begin the new leasing business in the spring of 1973 rather than in the fall of 1973. Appellee relied on these representations and commenced Cascade in May 1973. The Bank used Delahanty's concept and entered a competing business. As a result of the misrepresentations, appellees lost

Auto Sales and Cascade when the Bank refused to advance additional financing when it was needed in the fall of 1973.

It is clear that the judge could find these losses to be compensable in an action in fraud. The record, which appellee made, taken as a whole, is clear and convincing or clear, precise and indubitable. Consequently, appellee's evidence does measure up to the standard required to prove fraud and the judge properly refused to grant a non-suit at the conclusion of appellee's case. A prima facie case had been established which justified its submission to the fact-finder.

The next question to be resolved is whether the trial judge, sitting as the trier of fact, erred in returning a verdict for appellees and finding fraud.

Specifically, appellant argues that the trial court's crucial findings of fact are simply unsupported by the record. The lower court, sitting without a jury, made the following findings:

1. Edmund J. Delahanty developed after months of work a unique and novel method of leasing automobiles.

2. In February 1973, Mr. Delahanty met with authorized representatives of defendant, namely, Mr. Plumley, Mr. Tulskie and Mr. Dynan, for the purpose of presenting his proposal and to secure the necessary financing for the leasing business. At this time, Mr. Delahanty presented a written report labeled "Philosophy", which was supplied to all persons in attendance.

3. In April 1973, John Kearney, head of defendant's Industrial Loan Department, approved the financial backing of the leasing business provided that it was in operation by May 1973.

4. The defendant insisted on the May 1973 commencement date even though plaintiff told them that was not the best time to start such a business.

5. Defendant increased plaintiff's floor plan line of credit for this new business venture to $300,000.

6. Acting with justified reliance upon the agreement, Mr. Delahanty immediately placed orders for 300 autos in order to open by the agreed time of May 1973.

7. On June 6, 1973, defendant advised plaintiff that the Bank was going into the automobile leasing business. In a plan similar to plaintiff's concept.

8. Defendant had the work product of plaintiff in hand at the time it put together its plan that was designed to compete with plaintiff.

9. Defendant advised plaintiff that its business would not damage plaintiff's business.

10. On July 30, 1973, defendant issued a press release stating that it was entering into the auto leasing business under the marketing name of "LEASEIT".

11. Defendant wilfully, maliciously and knowing that its acts would destroy their competitor called plaintiff's loan, seized his inventory and liquidated.

12. Plaintiff Cascade Corporation would have been a profitable business had it not been for the fraudulent and malicious acts of defendant.

 It is well settled that any finding supported by the evidence of record is entitled to the same weight given a jury verdict, and the finding must be sustained unless the court abused its discretion or committed an error of law. *Eddystone Fire Co. No. 1 v. Continental Insurance Cos.*, 284 Pa.Super. 260, 425 A.2d 803 (1981). That is, the question of fraud is one of fact for the fact-finder and its finding must not be disturbed if warranted by the evidence. *Greenwood, supra.* Thus, the findings may only be overturned when they are not supported by the evidence. *Macchia v. Megow*, 355 Pa. 565, 50 A.2d 314 (1947).

 In reviewing the findings of the trial judge, the test is not whether the appellate court would have reached the same result on the evidence presented, but rather, after

due consideration of the evidence, a judge could reasonably have reached the conclusion of the trial judge. *School District of City of Harrisburg v. Pa. Interscholastic Athletic Assn.,* 453 Pa. 495, 309 A.2d 353 (1973). The evidence must be viewed in the light most favorable to the prevailing party below. *Krobot v. Ganzak,* 194 Pa.Super. 49, 166 A.2d 311 (1960). In examining the evidence of record and the trial judge's conclusions based on the evidence he found credible, we should be cognizant of the rule that it is not the province of an appellate court to find facts nor substitute its judgment for that of the trial judge. *Stowe v. Booker,* 284 Pa.Super. 53, 424 A.2d 1388 (1981). Therefore, we must accept the trial judge's findings with respect to the credibility of the witnesses and the weight to be accorded their testimony. *In Interest of Black,* 273 Pa.Super. 536, 417 A.2d 1178 (1980); *Commonwealth ex rel. Pruss v. Pruss,* 236 Pa.Super. 247, 344 A.2d 509 (1975).

Applying the above principles of law to the findings of fact in the instant case, a careful review of the record reveals that all of the court's findings were supported by the testimony and exhibits, except finding number 10 [1] and 12 [2].

The evidence adduced at trial may be summarized as follows. Delahanty, as the only witness for appellee, testified that when Plumley told him at the third presentation that the Bank had no intention of engaging in automobile leasing but was interested in only his leasing venture, he inferred that he would be considered the "leasing line" for the Bank. Furthermore, Delahanty stated that he only agreed to open Cascade in the spring of 1973 because Kearney insisted and assured him not to worry, because of

**1.** The trial judge found as a fact, in finding number 10, that the press release announcing "LEASEIT" was delivered on July 30, 1973. The lower court was mistaken. This press release was not sent out until December 4, 1973. This oversight by the court was a minor error which does not change any of our conclusions in the discussion upholding the trial court's ultimate finding of fraud.

**2.** See discussion on this finding of fact in the section on compensatory damages.

the Bank's money behind him. Delahanty felt that the Bank would be behind him 100 percent. His sense of security was bolstered by the officials' representations of the Bank's support.

Appellant's case consisted of the testimony of Kearney, Plumley and Dynan. Plumley, who had been involved in Delahanty's financing and in developing auto leasing for the Bank, admitted that Kearney had told him that Delahanty's idea was new, different and unique. Plumley was not questioned concerning his alleged misrepresentation made at the third meeting with Delahanty. He never denied that he told Delahanty that the Bank had no interest at all in going into auto leasing itself, or that once the decision was made to go into business for itself that the Bank would not hurt Delahanty.

Kearney admitted on the stand that Delahanty's concept for auto leasing was unique. Though Kearney approved the increase in this important account from $150,000 to $300,000 for the floor plan, he could not remember such details as the date he first met with Delahanty, who was present at that meeting, what was discussed or how long it lasted, or when he met with Delahanty again. Though he could not recall the meeting that took place when he received the fourth pamphlet, he did remember that at some point in time he had a discussion with Delahanty about when the business should commence. He did not remember Delahanty objecting to the starting date of the spring of 1973. Though Kearney could not recall any of the meetings which took place concerning this $300,000 account, he knew that he never made a representation as to the level of support the Bank was offering Delahanty. Kearney also denied being involved in the investigation of the auto leasing business for the Bank. He testified that he did not know anything about the Bank's interest until early 1973. This testimony was directly contradicted by the memoranda written by Dynan in August 1971 and May 1972.

Dynan agreed that Delahanty had a unique idea for auto leasing but that he found the February/March meeting,

which he attended as the marketing representative with Plumley and Becci, ludicrous. Despite how he felt about the meeting, Dynan did not convey his thoughts to Plumley or Becci. Dynan testified that he did not tell Delahanty at that meeting that the Bank was investigating auto leasing and did not recall Plumley stating that the Bank was not interested in going into the leasing business for itself. He admitted that Plumley and Becci were working with him on the investigation of auto leasing and that Plumley later accompanied him to California to meet with NLS. Dynan denied that he knew that Delahanty was receiving financing from the Bank for his leasing proposal. He stated that he never discussed with Plumley or Becci the feasibility of Delahanty's plan or about the profitability later. Dynan asserted that he did not check connections within the Bank for information concerning auto leasing financing, but instead relied solely on sources outside the Bank. While admitting he had received Delahanty's pamphlet presented at the meeting, he denied reading any part of it, despite his interest in the subject.

On the basis of the evidence before the court, the trial judge resolved the conflict in the testimony in favor of appellees and determined that there was sufficient evidence that appellant was liable for damages to appellee as a result of fraud and misrepresentation. The court decided the issue of credibility in favor of appellee, finding that the Bank officials' "pattern of convenient and selective memories of their actions ..., smack of a cover-up." The record is replete with inconsistencies and memory lapses which substantiate the finding that the Bank officials were not worthy of belief. It is clear that Delahanty's credibility and the validity of his entire claim were not impeached. Rather, as seen in the summary of the evidence, Delahanty's proof and credibility were considerably strengthened by the witnesses and exhibits offered by the defense. The oral testimony of one witness, uncorroborated, unsupported, and "... diametrically opposed by the testimony of another witness, cannot be considered evidence of such weight as to

make out a case beyond a reasonable doubt." *Laughlin v. McConnel,* 201 Pa.Super. 180, 184, 191 A.2d 921, 923 (1963). Such is not the case, instantly. Delahanty's testimony was supported by the exhibits and the testimony of witnesses for the defense. Rather than contradicting Delahanty, their testimony often supported his version of the facts. As noted previously, the crucial testimony about the representations, offered by the defense, was not recalled at all or was vague and inconsistent. Since there was ample evidence that appellees proved each element of fraud, we affirm the trial court's finding of fraud.

## *Compensatory Damages*

The court's finding of fact that Cascade would have been a profitable business had it not been for the fraudulent and malicious acts of the Bank leads us to appellant's next contention concerning the award of compensatory damages.

 Under Pennsylvania law, in an action based on fraud, the measure of damages is "actual loss", *Kaufman v. Mellon National Bank & Trust Co.,* 366 F.2d 326 (3rd Cir.1966), and not the benefit, or value, of that bargain. *Savitz v. Weinstein,* 395 Pa. 173, 178, 149 A.2d 110, 113 (1959). The victim is entitled to all pecuniary losses which result as a consequence of his reliance on the truth of the representations. *See, Neuman, supra.*

 The determination of damages is a factual question to be decided by the fact-finder. *Hagl v. Jacob Stern & Sons, Inc.,* 396 F.Supp. 779 (E.D.Pa.1975). This duty of assessing damages is within the province of the fact-finder and should not be interfered with unless it clearly appears that the amount awarded resulted from partiality, caprice, prejudice, corruption or some other improper influence. *Tonik v. Apex Garages, Inc.,* 442 Pa. 373, 275 A.2d 296 (1971). The fact-finder must assess the worth of the testimony, by weighing the evidence and determining its credibility, *Simmons v. Mullen,* 231 Pa.Super. 199, 331 A.2d 892 (1974), and by accepting or rejecting the estimates of the damages given by the witnesses. *Fierman v. Southeast-*

*ern Pennsylvania Transp. Authority,* 277 Pa.Super. 252, 419 A.2d 757 (1980). In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence. *Rea v. Ford Motor Co.,* 355 F.Supp. 842, 879 (W.D.Pa.1973), *vacated* 497 F.2d 577, *cert. den.* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106.

The standard in Pennsylvania civil cases for determining future damages is that the plaintiff bears the burden of proof by a "preponderance of the evidence." *Greenberg v. McCabe,* 453 F.Supp. 765 (E.D.Pa.1978), *aff'd.* 594 F.2d 854 (3rd Cir.1979); *Capitol Life Ins. Co. v. Rosen,* 69 F.R.D. 83 (E.D.Pa.1975). Under this criterion, the plaintiff is required to furnish only a reasonable quantity of information from which the fact-finder may fairly estimate the amount of damages. *Frankel v. U.S.,* 321 F.Supp. 1331, (E.D.Pa.1970), *aff'd.* 466 F.2d 1226 (3rd Cir.1972). Though justice and public policy require that the wrongdoer bear the risk of uncertainty which his own wrong has created and which prevents the precise computation of damages, the fact-finder still may not render a verdict based on speculation or guesswork. *Rea,* 355 F.Supp. 842, 879. Yet, the fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable and inferential, as well as upon direct and positive proof. *Rea* at 879. Thus, the law does not demand that the estimation of damages be completely free of all elements of speculation. *Taylor v. Paul O. Abbe, Inc.,* 380 F.Supp. 601 (E.D.Pa.1974) *rev'd* 516 F.2d 145 (3rd Cir.1975). While the trier of fact may not use sheer conjecture as a basis for arriving at a verdict, it may use a measure of speculation in aiming at a verdict or an award of damages, and an even greater degree of flexibility is granted in regard to testimony concerning prospective or future damages, which are at best, not always easy or certain of ascertainment and are to a large extent based on probabilities and uncertainties. *Starlings v. Ski Roundtop Corp.,* 493 F.Supp. 507 (M.D.Pa.1980). So then, mere uncer-

tainty as to the amount of damages will not bar recovery where it is clear that the damages were the certain result of the defendant's conduct. *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979).

■■■■ Generally, under Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences. *E.C. Ernst, Inc. v. Koppers Co., Inc.*, 626 F.2d 324 (3rd Cir.1980) on remand 520 F.Supp. 830 (W.D.Pa.1981). Although the law does not command mathematical precision from evidence in finding damages, sufficient facts must be introduced so that the court can arrive at an intelligent estimate without conjecture. *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, *cert. den.* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (3rd Cir.1975). Where the amount of damage can be fairly estimated from the evidence, the recovery will be sustained even though such amount cannot be determined with entire accuracy. *Massachusetts Bonding & Insurance Co. v. Johnston & Harder*, 343 Pa. 270, 22 A.2d 709 (1941). It is only required that the proof afford a reasonable basis from which the fact-finder can calculate the plaintiff's loss. *Myer Feinstein Co. v. DeVincent*, 151 Pa.Super. 254, 30 A.2d 221 (1943); *American Air Filter Co., Inc. v. McNichol*, 527 F.2d 1297 (3rd Cir.1976); *G.C.S., Inc. v. Foster Wheeler Corp.*, 437 F.Supp. 757 (W.D.Pa.1975).

In the instant case, the trial judge, sitting as the trier of fact, awarded appellee compensatory damages of $70,000. In support of this award for anticipated lost profits on a new business, Cascade, the court stated:

This court finds it is not necessary that business loss damages be proved to an absolute certainty in the case of a new business. Certainly, the court may not speculate, but a $70,000.00 award over a number of years is not speculation. Clearly, the earnings of Mr. Delahanty alone in a business of this kind would be and would prove to be more than the amount of the award. There is also the possibility, in a new venture, of a loss. Taking all the

factors and all the evidence which was presented, this court finds that $70,000.00 is consistent with the overall evidence produced as to the amount of the lost wages. It is not excessive.

It is well settled law in Pennsylvania that loss of profits are recoverable upon proper proof both in contract, *See Taylor v. Kaufhold,* 368 Pa. 538, 84 A.2d 347 (1951); *Western Show Co. v. Mix,* 308 Pa. 215, 162 A. 667 (1932), and in tort. *See, Kosco v. Hachmeister, Inc.,* 396 Pa. 288, 152 A.2d 673 (1959); *Ashcraft v. C.G. Hussey & Co.,* 359 Pa. 129, 58 A.2d 170 (1936). The general rule of law applicable for loss of profits in both contract and tort actions allows such damages where (1) there is evidence to establish them with reasonable certainty, (2) there is evidence to show that they were the proximate consequence of the wrong; and, in the contract actions, that they were reasonably foreseeable. *R.I. Lampus Co. v. Neville Cement Products Corp.,* 474 Pa. 199, 378 A.2d 288 (1977); *Frank B. Bozzo, Inc. v. Electric Weld Division,* 283 Pa.Super. 35, 423 A.2d 702 (1980), allocatur denied; Restatement, 2d, Contracts § 351.

A review of the cases in Pennsylvania involving lost profits shows that the courts are reluctant to award them, except when the business concerned is established and not "new and untried." Also, this kind of damage is usually seen in the context of a breach of contract. There are no cases in Pennsylvania which deal with the award of damages for anticipated lost profits in a fraud case.

Though damages for alleged lost profits can be given, they cannot be recovered where they are merely speculative. What our courts have demanded of the evidence to prove loss of profits was addressed in the recent case of *Pollock v. Morelli,* 245 Pa.Super. 388, 397–98, 369 A.2d 458, 463 (1976):

... Evidence must be introduced which forms a sufficient basis for estimating with reasonable certainty the amount of the lost anticipated profits. *Exton Drive-In, Inc. v. Home Indemnity Co.,* 436 Pa. 480, 261 A.2d 319 (1969),

*cert. denied,* 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970); *Western Show Co. v. Mix,* 308 Pa. 215, 162 A. 667 (1932); Restatement of Contracts § 331 (1932). Whereas recovery for the lost profits of an established business are considered ascertainable to a reasonable degree of certainty, *Guady v. Seaman,* 188 Pa.Super. 475, 149 A.2d 523 (1959), when a business is new and untried, courts have declared the measure of anticipated profits too speculative to provide a basis for an award of damages. *Exton Drive-In, Inc. v. Home Indemnity Co., supra; Platou v. Swanton,* 59 N.D. 466, 230 N.W. 725 (1930). *See also, Carpenters' Local 1686 v. Wallis,* 205 Okl. 285, 237 P.2d 905 (1951); *Richker v. Georgandis,* 323 S.W.2d 90 (Tex.Civ.App.1959).

In applying the above established principles of law, the *Pollock* court found that lost profits could not be recovered by a dry cleaning business which had only been in business for nine months before the landlord breached the contract. Because the business was new and untried, the proof of anticipated lost profits adduced at trial was too weak to support recovery.

The dissent in *Pollock* (written by Spaeth, J.) argued that the business was not "new and untried":

> While it is true that appellants had operated the business for only nine months ..., their immediate predecessor had operated it for over a year.... Appellants presented evidence of the monthly receipts during their predecessor's tenure.... The business was therefore not "new and untried", as the majority suggests it was.
>
> The majority seems to reach its conclusion that the business was "new and untried" by a comparison of appellants' business with the business in *Exton Drive-In, Inc. v. Home Indemnity Co.,* 436 Pa. 480, 261 A.2d 319 (1969), *cert. denied,* 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970). Such a comparison leads me to an opposite conclusion. In *Exton,* the business had never been in operation before the time of the alleged breach of contract. Thus appellants' business has been operated twen-

ty-three months longer than that in *Exton;* I suggest that is sufficient to remove it from the category of "new and untried". The majority also cites *Guady v. Seaman,* 188 Pa.Super. 475, 149 A.2d 523 (1959). There we held that testimony as to lost profits was admissible based on three periods of actual operation of the business in question: eight and one-half months at a first location; two weeks and "two or three days" at the location where the defendant-lessor allegedly breached his duty to supply water; and an indefinite period of time (from sometime in 1954 until the time of trial) at a third location. The present case thus falls between the poles of *Exton* and *Guady.* For me, it is closer to *Guady* than to *Exton.* I would therefore hold that appellants presented sufficient proof of lost profits.

*Id.* 245 Pa.Super. at 400, 369 A.2d at 464.

The most recent case in Pennsylvania which deals with damages for anticipated loss of profits is *General Dynafab, Inc. v. Chelsea Industries, Inc.,* 301 Pa.Super. 261, 447 A.2d 958 (1982) *Reargument denied* 8/4/82. That case was remanded by our court for a new trial on damages alone because the jury had been improperly instructed on the damages issue. The lower court was to allow evidence of lost profits to be introduced for the jury's consideration. In support of this decision, the court stated:

> Next, Chelsea asserts that lost profits may not be used as a measure of damages where, as here, a new business with no record of prior profitability exists. Decisions of this court and of our Supreme Court have suggested that damages for lost profits of a new business are too speculative. *Exton Drive-In v. Home Indemnity Co.,* 436 Pa. 480, 261 A.2d 319 (1979), *cert. den.* 400 U.S. 819, 91 S.Ct. 36, 37 L.Ed.2d 46 (1970); *Pines Plaza Bowling, Inc. v. Rossview, Inc.,* 394 Pa. 124, 145 A.2d 672 (1958); *Pollock v. Morelli,* 245 Pa.Super. 388, 369 A.2d 458 (1976). Nevertheless, our courts have held that damages may be assessed for loss of profit where such loss was reasonably foreseeable to the parties at the time that the

contract was entered and where those damages are capable of proof of reasonable certainty. *Taylor v. Kaufhold,* 368 Pa. 538, 84 A.2d 347 (1951); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 500 F.Supp. 1312 (W.D.Pa. 1980); Restatement, Contracts, § 331 (1932).

In applying these controlling principles of law the court went on to note:

While it is arguable here that Dynafab was a newcomer to the business herein, nevertheless, unlike the plaintiffs in *Exton Drive-In,* supra, *Pines Bowling, Inc.,* supra, and *Pollock,* supra, Dynafab was able to show that there was *significant interest* in their product before the contract breach occurred. The record demonstrates that Dynafab had commitments for orders from four sources. That Dynafab could demonstrate a sales record of Fiberweld Products during the previous concerning the projected sales, raw material needs and profitability of the Chelsea plant at Jersey Laminating and Finishing Company. Clearly, this evidence is not entirely of an unspeculative nature, however, we believe that if the jury believed it, it could come to a reasonable determination as to damages resulting from loss of future profits. Thus, we hold that the evidence should be submitted to the jury for it to decide its weight in the assessment of damages. *See Kasemer v. National Gas Distribution Corporation,* 279 Pa.Super. 334, 341 n. 1, 421 A.2d 226, 230 n. 1 (Spaeth, J. dissenting, 1980).

301 Pa.Superior Ct. at 265, 266, 447 A.2d at 960 (emphasis added).

The *Dynafab* court did not award lost profits to the business but held that the evidence of the alleged loss of profits should be introduced to the jury for them to determine if an award was proper. In doing this, the court applied the propositions advocated by Judge Spaeth in a footnote of his dissent in the *Kasemer* case [3]: 1) a business

3. We note that the majority in *Kasemer* did not even consider lost profits of the business involved, but denied damages altogether, finding that the company was not liable for the breach during the period

could be taken out of the "new and untried" category if it could show a "significant interest" in their product or service before the contract breach occurred, and 2) it is better that the jury hear the evidence of future lost profits and decide its weight than allow the court to exclude the evidence entirely.

■ *Dynafab's* adoption of this "significant interest" language in *Kasemer* does not, however, change the law in Pennsylvania that a new business still has a heavier burden in proving that lost profits are sufficiently certain to be recovered. The *Dynafab* court considered the "significant interest" shown in a business as one of many factors which are important in determining if the evidence of lost profits is sufficient to allow it to be submitted to the jury for consideration. *Dynafab* does not hold that proof of a "significant interest," by itself, is sufficient to support recovery of lost profits damages. The court concluded that the lower courts should liberally allow evidence of alleged lost profits to be submitted to the jury and let them decide if in light of the history of the business whether the amount of such profits could be estimated with reasonable certainty so as to allow recovery.

In the present case, Cascade was only in operation for seven months when the loans were called and the cars in the inventory of both Cascade and Auto Sales were surrendered. Delahanty sought to show a loss of profits by Cascade by introducing an exhibit which contained handwritten calculations, projecting Cascade's operation for six full years. Delahanty had prepared this table in preparation for trial, at the request and with the assistance of his attorney. Delahanty testified concerning what he used as the basis for the figures in the table. The basis for his estimations and projections was not, however, established in the record. No evidence was presented that supported the

of time it was bound by the Superior Court's supersedeas order, and it also was not liable for acts done in compliance with the orders of the Public Utility Commission. Judge Spaeth's footnote in the dissent addressing lost profits as a measure of damages was therefore dicta.

assumption that the business would have a profit the first year of operation and that this profit would increase annually at a rate of ten (10) percent. The ten (10) percent markup standard was taken from the industry statistics for March, 1980, the time of trial, rather than 1973, the time period when the loss would have been sustained. While Delahanty's table estimated that 560 cars would be leased in the first year of operation, resulting in a profit of approximately $99,000, after seven months in business only 42 cars had been leased with no profit being realized.

█ Even applying the so-called "significant interest" test of *Kasemer*, we find that while the evidence of alleged lost profits was properly admitted into evidence,[4] it was too speculative to support an award of anticipated lost profits. Furthermore, unlike the product in *Kasemer*, Cascade had not leased cars *at a profit* before the business folded.

In concluding that Cascade is a "new and untried" business whose measure of damages for lost profits is too speculative to serve as a measure of damages, we compare appellees' business with those in *Exton, Guady* and *Pollock*.

As noted above, Cascade was only in business for approximately seven months. The business in *Exton* had never been in operation before the breach of contract occurred. In *Guady*, the business had operated at three locations, the last for an indefinite period of time. In *Pollock*, the majority found the business had operated for only nine months prior to the breach of contract, while the dissent argued that evidence of an immediate predecessor operating the same business for over a year should be considered, making the time of operation twenty-three months.

Like *Pollock*, the instant case falls between *Exton* and *Guady*. Appellees' business has operated two months shorter (sixteen months shorter if dissent followed) than

4. Following the lead of *Dynafab* and *Kasemer*, we find that the lower court properly allowed the evidence of lost profits though there was a question of its admissibility. It is better to allow such evidence to be submitted to the fact finder than to exclude it entirely.

that in *Pollock.* This case is then closer to *Exton* than to *Guady.* Appellees' business might or might not have been profitable. Thus, the element of reasonable certainty needed to collect damages for lost profits is lacking. The possible loss of profits is too speculative and conjectural to form a basis of recovery. Consequently, we cannot permit a recovery for the anticipated loss of profits of Cascade.

 However, our holding that the anticipated profits were too speculative to sustain an award of damages for Cascade does not defeat appellees' claim of damages for the destruction of Delahanty's existing business, Auto Sales.

 It is well settled that lost income or profit is recoverable in an action for the destruction or interruption of an established business, whenever they are not merely speculative or conjectural. In general, a court has the power to award damages up to the date of the ultimate judgment of the case. *Rea v. Ford Motor Co.*, 560 F.2d 554, 557 (3rd Cir.1977), *cert. den.* 434 U.S. 923, 98 S.Ct. 401, 54 L.Ed.2d 281. Where lost income is redeemable, however, "the testimony must show with a fair degree of certainty not only the diminution of income or profit but that it is fairly attributable to the wrong complained of." *See Platou v. Swanton*, 59 N.D. 466, 474–75, 230 N.W. 725, 728 (1930). The evidence of the plaintiff's four previous years' earnings and four subsequent years' earnings was properly received to estimate profits or income lost by the plaintiff as a result of the breach. *See, Gouldey v. Currie*, 88 Montg. 33 (1967); *Cf. Eazor Express, Inc. v. International Brotherhood of Teamsters, Chauffers, Warehousemen & Helpers of America*, 520 F.2d 951, 968 (3rd Cir.1975) *cert. den.* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342, *Reh. den.* 425 U.S. 908, 96 S.Ct. 1502, 47 L.Ed.2d 758 (the court held that the evidence of sales before and after a breach are acceptable proof showing the amount of revenue lost by the plaintiff as a result of the breach).

 In the present case, there was evidence in the record that Auto Sales was an established business and had been

in operation for about five years before Cascade was formed. As a result of appellant's fraud, Auto Sales and Cascade were destroyed. Auto Sales eventually was to handle the retail end of the auto leasing venture, selling the cars if the lessee did not take the option of buying the car at the end of the lease. There was also testimony and exhibits presented which showed Delahanty's subsequent personal loss of income from the demise of Auto Sales. Delahanty's income tax returns, for the period 1972 through 1975, revealed an income of $5097.00, a loss of $4323.40, an income of $6655.61, and income of $8876.00 respectively. His average income for the period preceding the fraudulent misrepresentations, from 1968 through 1971, was $14,-106.26. Deducting the four subsequent years' income from his average income, there was a total loss to Delahanty from Auto Sales in the amount of $40,119.83 or approximately $40,000.00.[5]

Pursuant to our power to modify the order of the court below provided by the Act of July 9, 1976, P.L. 586, No. 142, § 2; 42 Pa.C.S.A. § 706[6], we award appellee $40,000.00 in compensatory damages for the destruction of Delahanty Auto Sales and the consequent loss of income to Delahanty. This means that the lower court's award of $70,000.00 for compensatory damages must be reduced to $40,000.00.[7]

5. The record clearly established Delahanty's personal income only for the period 1972 through 1975. Therefore, the recovery of future profits was necessarily limited to this period.

6. Section 706 provides:
 An appellate court may affirm, modify, vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances.
 Act of 1976, July 9, P.L. 586, No. 142, § 2; 42 Pa.C.S.A. § 706.

7. The testimony and exhibits relating to Cascade's lost profits indicated a possible award in an amount greatly in excess of $30,000. However, the calculations were woefully inadequate. This Court cannot ascertain how the trial judge could have calculated lost profits to be only $30,000. It would seem that because of the state of the record, he could only have been speculating. It is important to note that the evidence presented in *Merion Springs v. Torres,* 315 Pa.Super.

## Punitive Damages

The lower court, sitting as trier of fact, concluded that an award of punitive damages was appropriate under the facts of this case. Appellant advances several grounds for rejecting the court's award. First, they contend there is no evidence of "outrageous" conduct by the Bank's employees to support the award of punitive damages against the Bank. Second, they argue that the punitive damage award was grossly disproportionate to the award of compensatory damages and the trial court erred in applying a ratio of almost 11 to 1.

 Initially, we note that under Pennsylvania law, the right to punitive damages is a "mere incident to a cause of action." *Hilbert v. Roth*, 395 Pa. 270, 276, 149 A.2d 648, 652 (1959). Awards of punitive damages cannot be made where no actual damages have been suffered. *See, Weider v. Hoffman*, 238 F.Supp. 437 (M.D.Pa.1965). *But see, Rhoads v. Heberling*, 306 Pa.Super. 35, 451 A.2d 1378 (1982).

The purpose of punitive damages in tort actions was indicated by the Third Circuit Court of Appeals in *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1277 (3rd Cir.1979), *quoting Medvecz v. Choi*, 569 F.2d 1221, 1227 (3rd Cir.1977):

> The question ..., in tort actions generally, is whether there has been sufficiently aggravated conduct contrary to the plaintiffs' interests, involving bad motive or reckless indifference, to justify the special sanction of punitive damages. That sanction serves the dual function of penalizing past conduct constituting an aggravated violation of anothers interests, and of deterring such behavior in the future.

*See also, Thomas v. American Cystoscope Maker, Inc.*, 414 F.Supp. 255, 263 (E.D.Pa.1976).

469, 462 A.2d 686 (1982) was quite detailed and, accordingly, this Court awarded future lost profits in that case.

Thus, the purpose of punitive damages is two-fold, to punish the wrongdoer and to deter both him and others from engaging in similar conduct in the future. *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355 (1963); *Smith v. Brown*, 283 Pa.Super. 116, 423 A.2d 743 (1980); *Esmond v. Liscio*, 209 Pa.Super. 200, 224 A.2d 793 (1966); Restatement of Torts § 908, Comment (a).

It is well settled law in Pennsylvania that the decision of whether to award punitive damages and the amount to be awarded are within the discretion of the fact finder. *See Focht v. Rabada*, 217 Pa.Super. 35, 268 A.2d 157 (1970); Restatement of Torts, § 908(2) (1939); *See also King v. Towns*, 102 Ga.App. 895, 118 S.E.2d 121 (1961); *Leimgruber v. Claridge Associates, Ltd.*, 73 N.J. 450, 456, 375 A.2d 652, 655 (1977). Although punitive damages are not a favorite of the law, *Cochetti v. Desmond*, 572 F.2d 102 (3rd Cir.1978), they will only be reduced on appeal if the reviewing court determines that they are excessive under the facts of the individual case. *International Electronics Co. v. N.S.T. Metal Products Co.*, 370 Pa. 213, 88 A.2d 40 (1952).

In considering appellant's first contention questioning appellees' right to punitive damages, we note that Pennsylvania had adopted the rule for punitive damages as set forth in § 908 of the Restatement of Torts and the comments thereunder. *Chambers* 411 Pa. at 344, 192 A.2d at 358; *Hughes v. Babcock*, 349 Pa. 475, 480–81, 37 A.2d 551, 554 (1944); *Focht* 217 Pa.Super. at 38, 268 A.2d at 159; *See Medvecz* at 1226.

Punitive damages are defined by Section 908(1), as damages other than compensatory or nominal, "awarded against a person to punish him for outrageous conduct." Thus, exemplary damages are proper when the act which creates actual damages also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights. *Golomb v. Korus*, 261 Pa.Super. 344, 396 A.2d 430 (1977); *See U.S. ex rel. Motley v. Rundle*, 340

F.Supp. 807 (E.D.Pa.1977). Punitive damages may be given when the act is done with reckless indifference, as well as, bad motive. *Bacica v. Board of Ed. of Sch. Dist. of Erie*, 451 F.Supp. 882 (W.D.Pa.1978). Thus, a court may not award punitive damages merely because a tort has been committed. Additional evidence must demonstrate wilful, malicious, wanton, reckless or oppressive conduct. *Pittsburgh Outdoor Adv. Co. v. Virginia Manor Apts., Inc.*, 436 Pa. 350, 353, 260 A.2d 801, 803 (1970); *Hughes* 349 Pa. at 480, 37 A.2d at 554; *See also Franklin Music Co. v. American Broadcasting Cos., Inc.*, 616 F.2d 528, 542 (3rd Cir.1979). Though this rule seems to require the plaintiff to meet an additional burden, it is difficult to picture a fact pattern which would support a finding of intentional fraud without providing proof of "outrageous conduct" to support an award of punitive damages.

We note that other jurisdictions, while agreeing with the above standard, have found that fraudulent misrepresentation by itself is sufficient to uphold an award of punitive damages because of the state of mind rendering it fraudulent. *Nader v. Allegheny Airlines, Inc.*, 445 F.Supp. 168 (D.C.1978); *See also Jackson v. General Motors Acceptance Corp.*, 140 A.2d 699 (D.C.Mun.Ct.App.1958); *Starkweather v. Shaffer*, 262 Or. 198, 497 P.2d 358 (1972) (breach of fiduciary duty and misrepresentations sufficient to support award of punitive damages); *Aschoff v. Mobile Oil Corp.*, 261 N.W.2d 120 (S.D.1977) (exemplary damages upheld in connection with fraud in a business contract where defendant had made false and fraudulent representations which induced the execution of a contract); *Compare Gass v. Gamble-Skogmo, Inc.*, 357 F.2d 215 (7th Cir.1966) (punitive damages recoverable in an action for fraud and deceit when the false representations are wantonly and designedly made).

As part of the first issue dealing with appellees' right to punitive damages, appellant also maintains that even assuming a proper finding of fraud, the trial court erred in

imposing vicarious liability for punitive damages upon the Bank.

Though Pennsylvania has adhered to the rule for punitive damages enunciated in § 908 of the Restatement of Torts, it has not adopted the standard of § 909 of the Restatement of Torts [8] which limits an employers liability for punitive damages imposed for the torts of his employee. In rejecting this rule, the Third Circuit, in *Skeels v. Universal C.I.T. Credit Corp.*, 335 F.2d 846 (3rd Cir.1964), stated:

> ... Many jurisdictions will not permit punitive damages against a corporation, or any other principal, for misconduct of a servant or agent unless the situation is one in which it can fairly be said that the principal has sanctioned the misconduct or should have known that the wrongdoer was an unsuitable employee. (citations omitted) But Pennsylvania is less restrictive in permitting a punitive award against a corporation for an employee's tort. The leading case of *Lake Shore & Michigan So. Ry. v. Rosenzweig*, 1886, 113 Pa. 519, 544, 6 A. 545, 553, states and applies the rule that a "corporation is liable for exemplary damages for the act of its servant, done within the scope of his authority, under circumstances which would give such [a] right to the plaintiff as against the servant".... But, recognizing the harshness of this rule, the Supreme Court of Pennsylvania has warned that "too great caution cannot be exercised in permitting the recovery of punitive damages for the willful or reckless act of a servant not authorized or approved by the master".... The sum of the matter seems to be that the conduct of the agent who inflicts the injury complained of must be

**8.** Section 909 of the Restatement of Torts provides:
Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
(a) the principal authorized the doing and the manner of the act, or
(b) the agent was unfit and the principal was reckless in employing him, or
(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
(d) the employer or a manager of the employer ratified or approved the act.

rather clearly outrageous to justify the vicarious imposition of exemplary damages upon the principal. *Chambers v. Montgomery*, 1963, 411 Pa. 339, 192 A.2d 355. *Id.* at 851–52; *See also Chuy* at 1278.

In the more recent case of *Hannigan v. S. Klein's Dept. Store*, 1 D & C 3rd 339, *aff'd Per Curiam* 244 Pa.Super. 597, 371 A.2d 872 (1976), our court upheld an award of punitive damages against a corporate defendant when the actions of its employee were found to be "clearly outrageous." The conduct had occurred during the course of employment, it was within the scope of the employees' duties and the conduct was not done to satisfy personal ill will or malice but with the intent to further the corporations' interests.

In the instant case, the lower court, sitting as trier of fact, found that appellee was entitled to punitive damages. In support of this decision, the court held:

... As to the punitive damages, punitive damages are awarded solely for outrageous misconduct. This court has found the defendant's action absolutely unconscionable and outrageous. This is a defendant who in the course of business builds up tremendous information concerning their customers and their customers' need for cash, and the manner in which their customers operate their businesses. This defendant took that information provided to it in confidence in a justifiable reliance that the information is used for the information and purpose for which it is requested and then used that information to enrich itself. Mr. Kearney admitted that he turned the proposal of automobile business clients over to the bank's marketing division ... The information which defendant possessed was used to support its own business which competed with plaintiff. At the same time the defendant acted to put plaintiff out of business. No finer case could be made for outrage than the facts produced by this plaintiff against First Pennsylvania Bank.

In light of the applicable principles of law which govern the award of punitive damages, we find that there

was sufficient evidence in the record to support a finding that appellant's conduct was "outrageous," and involved a bad motive. The actions by the Bank officials occurred during the course of their employment was within the scope of their duties and was done with the intent to further the Bank's interests. We, therefore, conclude that the imposition of vicarious liability for punitive damages upon the Bank was proper.

A further objection to the award of punitive damages concerns the amount. Appellant contends that the punitive damages of $750,000 was disproportionate to the compensatory damages of $70,000, and the ratio of almost 11 to 1 which was used to calculate the punitive award was excessive.

 Under Pennsylvania law, the amount of punitive damages must bear a reasonable relationship to the award of compensatory damages. *See, e.g. Hughes v. Babcock*, 349 Pa. at 481, 37 A.2d at 554; *Mitchell v. Randal*, 288 Pa. 518, 137 A. 171 (1927). The reasonable relationship between the two should vary, depending on the egregiousness of the actor's wrongful conduct and the relative generosity of the compensatory award. *Thomas v. E.J. Korvette*, 329 F.Supp. 1163 (E.D.Pa.1971); *rev'd* 476 F.2d 471 (3rd Cir. 1973).[9]

 Punitive damages are considered to be excessive when they are so large as to indicate that the fact finder was influenced by passion or prejudice, *Smith v. Bowater S.S. Co.*, 339 F.Supp. 399 (E.D.Pa.1972); *Thompson v.*

---

9. In *Rhoads v. Heberling*, 306 Pa.Super. 35, 451 A.2d 1378 (1982), a panel of this Court in an Opinion by Popovich, J., upheld an award of punitive damages where there had been no award for compensatory damages. However, in that case there was no question of liability on the part of the appellant, who had fired eight bullets from a semi-automatic rifle at a vehicle which was occupied by the four appellees. The court justified its decision on the basis that this was most definitely wanton and reckless behavior, which brought this conduct under the purview of the Restatement 2d § 908 Comment (b) ("Reckless indifference to the rights of others and conscious action in disregard of them may provide the necessary state of mind to justify punitive damages.")

*Swank*, 317 Pa. 158, 176 A. 211 (1934), when they do not bear a reasonable relation to the injury, *Thompson, supra; See also Mitchell v. Randal, supra*, or they are disproportionate to compensatory damages awarded. *Givens v. W.J. Gilmore Drug Co.*, 337 Pa. 278, 10 A.2d 12 (1940). They are not considered to be disproportionate to the compensatory damages unless they are greatly in excess of actual damages. *See Thomas v. E.J. Korvette*, 329 F.Supp. at 1170; *Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A.2d 662 (1963). In determining if a verdict is excessive every case must be evaluated according to its own facts. *DeMarines v. KLM Royal Dutch Airlines*, 433 F.Supp. 1047 (E.D.Pa.1977), *rev'd* 580 F.2d 1193 (3rd Cir. 1978).

■ The law in Pennsylvania establishes no fixed ratio between compensatory and punitive damages by which to determine excessiveness. Any fixed ratio would run counter to the object of punitive damages, which is to punish the defendant and set an example to deter him and others from this type of conduct in the future. Thus, the fact finder should be given broad discretion in assessing the amount which would be sufficient to attain the above objective. When the amount of the award is so clearly excessive as to constitute an error of law and abuse of discretion, a new trial will be ordered. *Scaife Co. v. Rockwell-Standard Corporation*, 446 Pa. at 290, 285 A.2d at 456.

■ Comment (e) to § 908 of the Restatement of Torts provides:

In determining the amount of punitive damages, as well as deciding whether they shall be given at all, the trier of fact can properly consider not merely the act itself, but all the circumstances including the motives of the wrongdoers, the relations between the parties, and the provocation or want of provocation for the act.

*See Thomas v. American Cystoscope* at 263; *Chambers, supra; Focht, supra*. Section 908(2) of the Restatement also states:

Where punitive damages are permissible, their allowance and amount are within the discretion of the trier of fact. In assessing such damages, the trier of fact can properly consider the character of the defendant's acts, the nature and extent of the harm to the plaintiff which the defendant caused or intended to cause and the wealth of the defendant.

Thus, any mathematical ratio as to damages should be based on the seriousness of the defendant's misconduct and should consider the wealth of the defendant so that a suitable punishment can be imposed.

In the recent case of *Chuy v. Philadelphia Eagles Football Club, supra,* the Third Circuit affirmed an award of compensatory damages of $10,000 for tort damages and a $60,590 punitive damage award. In refusing to reduce the punitive recovery, although it was more than six times the compensatory damages, the largest ratio approved in any decision applying Pennsylvania law, the court stated:

... In view of the unusual circumstances of this case and giving the plaintiff the benefit of all inferences to which he is now entitled, we are unable to conclude that the district court erred in not reducing the jury's award of punitive damages.

*Id.* at 1279.

In the present case, the trial court, in calculating punitive damages, considered the wealth of the defendant, stating:

... We are left only with the dollar amount $750,000. The argument of the defendant that anything above six times the amount of the actual damages, $70,000 would be excessive and shouldn't hold against this particular defendant. This is a defendant with millions of dollars in assets and who has substantial net equity. A punitive damages award against this defendant of $5,000.00 or even $10,000.00 would be meaningless. The purpose of a punitive damage award is to penalize the defendant for its outrageous conduct, not only for the defendant, but for all similar defendants. Clearly, in light of the nature of this defendant $750,000.00 is not excessive.

█ Since there is a proportionate relationship between actual and exemplary damages, the decrease in compensatory damages from $70,000 to $40,000, necessitates a reduction in punitive damages. In computing damages below, the court awarded approximately eleven (11) times the amount of compensatory damages. Applying this ratio to the diminished compensatory award, punitive damages must be reduced from $750,000 to $440,000, for a total recovery of $480,000.

█ In determining the amount of punitive damages, the lower court took into account not only the Bank's wealth but also, the outrageous conduct of the Bank's officials, their motive, the relationship between the parties and the nature and extent of the harm to appellees' businesses. After a thorough review of the record, we find that the ratio used by the lower court was not so clearly excessive as to require a reduction or a new trial on the damages issue.

### Counterclaims

Addressing the counterclaims, we find that Cascade is not liable on count 1, in the amount of $55,460.01, for the deficiency between the outstanding balance due on the floor plan agreement and the amount recovered by First Pennsylvania Bank from the sale of the repossessed collateral.

█ Pennsylvania requires that a secured party who disposes of collateral after default do so in a reasonable manner. *In re Nellis*, 22 UCC Rep. 1318 (E.D.Pa.1977). Furthermore, notice shall be sent to the debtor apprising him of the time and place of any public or private sale of the repossessed collateral. Act of Nov. 1, 1979, P.L. 255, No. 86 § 1; 13 Pa.C.S.A. 9504.[10]

10. **§ 9504. Right of secured party to dispose of collateral after default; effect of disposition**
 (a) Disposition of collateral and application of proceeds.—A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of

goods is subject to Division 2 (relating to sales). The proceeds of disposition shall be applied in the order following to:

(1) the reasonable expenses of retaking, holding, preparing for sale, selling and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party.

(2) the satisfaction of indebtedness secured by the security interest under which the disposition is made; and

(3) the satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed. If requested by the secured party, the holder of a subordinate security interest must seasonably furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.

(b) Rights of parties in case of surplus or deficiency.—If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and unless otherwise agreed, the debtor is liable for any deficiency. But if the underlying transaction was a sale of accounts, contract rights, or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides.

(c) Manner of disposition.—Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this Commonwealth or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.

(d) Rights of purchaser for value of disposed collateral.—When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the rights of the debtor therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this chapter or of any judicial proceedings:

(1) in the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or

It is obvious that First Pennsylvania Bank proceeded in a fashion completely inconsistent with Section 9504, flagrantly disregarding our legislative mandate, while again ignoring Cascade's right to a fair liquidation of its inventory. The Bank's employees themselves testified that there was no notice of sale sent to Cascade, no notice of sale was published, but rather notice was made "by word of mouth." Additionally, cars were sold to Bank employees without the solicitation of bids, and Bank employees made their own determination as to what was the fair market value of the purchased automobiles. This is an unpalatable affront to the notion of fairness in commercial financing and shocks this Court's conscience.

The remedy available to Cascade flows from 13 Pa.C.S.A. § 9507,[11] which allows the debtor to recover from the se-

(2) in any other case, if the purchaser acts in good faith.
 (e) Right of subrogation of person liable to secured party.—A person who is liable to a secured party under a guaranty, indorsement, repurchase agreement or the like and who receives a transfer of collateral from the secured party or is subrogated to his rights has thereafter the rights and duties of the secured party. Such a transfer of collateral is not a sale or disposition of the collateral under this division.
1979, Nov. 1, P.L. 255, No. 86, § 1, effective Jan. 1, 1980.

11. § 9507. **Liability of secured party for failure to comply with chapter**
 (a) General rule.—If it is established that the secured party is not proceeding in accordance with the provisions of this chapter disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this chapter. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus 10% of the principal amount of the debt or the time price differential plus 10% of the cash price.
 (b) Disposition in commercially reasonable manner.—The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at

cured party any loss caused by the secured party's failure to comply with the provisions of § 9504.

In *Small Business Administration v. Chatlin's Department Store*, 506 F.Supp. 108 (2nd Cir.1980), the court, applying Pennsylvania law, held that once the issue of commercial reasonableness is raised, the creditor must rebut the presumption that the value of the collateral equals the indebtedness secured. *Id.* at 112. This was the same position adopted in *Beneficial Consumer Discount Co. v. Savoy*, 291 Pa.Super. 649, 436 A.2d 687 (1981), where the court decided that since the creditor or secured party is the plaintiff in an action for a deficiency, the burden of proving his case should not shift to the debtor when it is the creditor-secured party who has violated the commercially reasonable standard in connection with the disposition of the collateral. *In re U.G.M. Corp.*, 20 UCC Rep. 827 (E.D.Pa.1976).

■ Since the record is without a scintilla of evidence as to the fair market value of the automobiles sold, First Pennsylvania Bank has not rebutted the presumption that the value of the collateral is equal to the balance due on the floor plan agreement. Therefore, we find against First Pennsylvania Bank on Count 1.

■ With respect to counts 3 and 6, each in the amount of $45,682.80, we find that the judgment by confession entered in Common Pleas Court of Delaware County operates as res judicata, now barring examination by this Court of that judgment or any other claims arising out of the

the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable.
1979, Nov. 1, P.L. 255, No. 86, § 1, effective Jan. 1, 1980.

same transaction or nucleus of events. Pa.R.Civ.P. 1020(d)(1), 42 Pa.C.S.A. ℅ *Devlin v. Piechoski*, 374 Pa. 639, 99 A.2d 346 (1953); *Stradley v. Bath Portland Cement Co.*, 228 Pa. 108, 77 A. 242 (1910); *Weaver v. Adams*, 132 Pa. 392, 19 A. 271 (1890). Challenge must be made pursuant to Pa.R.Civ.P. 2959, 42 Pa.C.S.A. The proper forum to challenge a confessed judgment is the place where the judgment has been entered.

■■■ With respect to count 2, in the amount of $26,-072.12, the capital advance made to Cascade, we must find in favor of First Pennsylvania Bank as the only proffered defense to this claim is based upon the proposition that First Pennsylvania Bank is not a holder in due course of the note which evidences the indebtedness.

Assuming arguendo that First Pennsylvania Bank is not a holder in due course because they did not take the notes in good faith, 13 Pa.C.S.A. § 3306 becomes apposite.[12] In pertinent part, § 3306 states that one who takes an instrument and is not a holder in due course, takes said instrument subject to all valid claims and defenses thereunder. The failure, however, of the plaintiffs to assert any real defense against the instrument itself is fatal to their case. Therefore, we must find in favor of First Pennsylvania Bank on Count 2.

12. § 3306. **Rights of one not holder in due course**
 Unless he has the rights of a holder in due course any person takes the instrument subject to:
 (1) all valid claims to it on the part of any person;
 (2) all defenses of any party which would be available in an action on a simple contract;
 (3) the defenses of want or failure of consideration, nonperformance of any condition precedent, nondelivery, or delivery for a special purpose (section 3408 (relating to consideration)); and
 (4) the defense that he or a person through whom he holds the instrument acquired it by theft, or that payment or satisfaction to such holder would be inconsistent with the terms of a restrictive indorsement. The claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person defends the action for such party.
 1979, Nov. 1, P.L. 255, No. 86, § 1, effective Jan. 1, 1980.

■ As to count 4, in the amount of $81,532.13, representing the personal guarantee of the Delahantys for the default of Cascade on the floor plan arrangement, (count 1 of $55,460.01 and count 2 of $26,072.12 for capital advance), we find in favor of First Pennsylvania Bank for $26,072.12. We reach this reduced amount for two reasons. First, since Cascade itself is not liable for the alleged deficiency, then neither can the Delahantys be liable as guarantors. Second, since Cascade is now defunct and the Delahantys guaranteed payment of Cascade's obligations, the Delahantys are liable on their personal guarantee dated May 17, 1973, in the amount of $26,072.12, for the same reasons stated above in count 2. This recovery, of course, forecloses any subsequent attempt by First Pennsylvania Bank to recover against Cascade for count 2, as a debt may only be satisfied once.

■ Lastly, we find in favor of First Pennsylvania Bank on count 5, in the amount of $45,682.80, on the Delahantys' personal guarantee dated February 25, 1971, which guaranteed their promissory note dated March 9, 1973. First Pennsylvania Bank having confessed judgment on the above-mentioned note triggers the Delahantys' liability as guarantors. Again, the Delahantys' failure to assert any real defense to this instrument makes them liable in the amount of $45,682.80. While we may not disturb the confessed judgment in Common Pleas Court of Delaware County, we believe the recovery in the instant case forecloses any subsequent attempt by First Pennsylvania Bank to execute on the Delaware County judgment.

We now remand to the trial court to enter judgment for the Delahantys in the amount of $480,000.00, and for First Pennsylvania Bank against Cascade in the amount of $26,-072.12, and for First Pennsylvania Bank against the Delahantys in the amount of $45,682.80 and $26,072.12 on counterclaims 4 and 5. We no longer retain jurisdiction in this matter.

Judgment affirmed in part and reversed in part.

SPAETH, J., files a concurring and dissenting opinion:

I concur in the majority's decision except as to the punitive damages, which I think are excessive, even as reduced by the majority.

An appellate court may reduce the amount of punitive damages if it finds them excessive. *Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A.2d 662 (1963). Whether they are excessive will depend on the circumstances of the particular case, *International Electronic Co. v. N.S.T. Metal Products Co.*, 370 Pa. 213, 88 A.2d 40 (1952), for no two cases are the same. *Shelton v. Evans*, 292 Pa.Super. 228, 437 A.2d 18 (1981). More specifically, punitive damages are excessive if they are disproportionate to the compensatory damages awarded, *Golomb v. Korus*, 261 Pa.Super. 344, 396 A.2d 430 (1978), or have no reasonable relation to the amount of compensatory damages, *Hughes v. Babock*, 349 Pa. 475, 37 A.2d 551. *See also Thomas v. E.J. Korvette*, 329 F.Supp. 1163 (E.D.Pa.1971). A consideration of proportionality persuades me that here the punitive damages awarded by the majority are excessive. I have found no case with nearly so high a multiplier as eleven times compensatory damages. *See, e.g. Purcell v. Westinghouse Co., supra* (punitive damages of $50,000 reduced to $30,000 in defamation suit where compensatory damages were $10,-000); *Richette v. Pennsylvania R.R.*, 410 Pa. 6, 187 A.2d 910 (1963) (punitive damages of $15,000 reduced to $5,000 in interference with contract suit where compensatory damages were $10,000); *Voltz v. G.M.A.C.*, 332 Pa. 141, 2 A.2d 697 (1938) (punitive damages of $2,500 in replevin action reduced on appeal to $1,000 where actual damages were $859); *Thompson v. Swank*, 317 Pa. 158, 176 A. 211 (1934) (in unlawful restraint action, where plaintiff awarded $200 in actual damages, $3,000 in punitive damages reduced to $1,500 because grossly disproportionate).

I should award punitive damages of no more than $250,-000—the amount requested by plaintiff-appellee below.