**James R. HUFF, Esq., Trustee for the Bankruptcy Estate of Ivan R. Berringer and Lois M. Berringer, Plaintiff,**

v.

**NATIONWIDE INSURANCE COMPANY, Defendant.**

**Civ. A. No. 91–122J.**

United States District Court, W.D. Pennsylvania.

July 1, 1992.

**56**

James R. Walsh, Johnstown, PA, for plaintiff.

Gilbert E. Caroff, Johnstown, PA, for defendant.

### MEMORANDUM OPINION

D. BROOKS SMITH, District Judge.

#### I. *Introduction*

Debtors Ivan and Lois Berringer filed a voluntary bankruptcy petition pursuant to Chapter 7 of the Bankruptcy Code on February 4, 1988. *See* 11 U.S.C. § 101 *et seq.* The bankruptcy court appointed James Huff, Esq. as bankruptcy trustee. *See* 11 U.S.C. §§ 701, 702(d). Shortly thereafter, on September 12, 1988, Huff, acting as trustee, brought an adversary proceeding against Ivan Berringer's former employer, Nationwide Insurance Company ("Nationwide").

In the original adversary complaint, the trustee alleged that Nationwide wrongfully withheld from Berringer compensation in the amount of·$38,698.22 at the time of Berringer's resignation (Complaint ¶ 9). The trustee further alleged that Nationwide improperly withheld money due Berringer pursuant to a fraudulent representation that it was "entitled[d] to so do under a claim of 'set-off' . . . ." (Complaint ¶ 6). The complaint sought an accounting on a theory of fraudulent misrepresentation.

Nationwide filed an answer which stated that none of its communications with Berringer amounted to a claim of entitlement (Answer ¶ 6). Nationwide asserted that its post-termination communications with Berringer merely identified Berringer's outstanding liabilities (Answer ¶ 6), and the company denied that it represented to Berringer that it was legally entitled to the outstanding funds as a "set-off" against money received by Berringer. (*Id.*)

Nationwide also pleaded several affirmative defenses. It contended, *inter alia*, that it was entitled to the money by virtue of assignments made by Berringer. Nationwide further asserted that the trustee's claim arose under paragraph 11 of the Agency Agreement which sets forth a three year limitations period for all legal actions and that the claim was therefore time barred.

The bankruptcy court held a hearing on February 22, 1991. Judge Markovitz issued a memorandum opinion on March 29, 1991 in which he concluded that the underlying adversary proceeding was not an action brought pursuant to the Agency Agreement but was rather a tort action for fraudulent misrepresentation. 125 B.R. 444, 448.[1] The bankruptcy court found that the action was governed by Pennsylvania's former six year statute of limitations for fraud actions rather than the three year limitations period called for by Berringer's Agency Agreement (*Id.*). It therefore held that the action was not time barred and concluded that Nationwide had fraudulently misrepresented its right to Berringer's deferred compensation (the term "deferred compensation" will be used to describe both the Extended Earnings and the Deferred Compensation Incentive Credits which Berringer had accrued). The bankruptcy court also found that Berringer had not made any assignments in favor of the Credit Union, and granted the trustee's request for relief. Nationwide was ordered to pay the trustee $34,599.74 plus interest at the statutory rate of 6% per annum. This appeal followed.

#### II. *The facts*

The parties stipulated to many of the relevant facts before the bankruptcy court com-

---

**1.** "Mem.Op." refers to the 20 page memorandum opinion issued by Judge Markovitz of the bank- ruptcy court.

menced trial. Berringer became an agent for Nationwide on September 11, 1971 (125 B.R. at 446), and during the course of his employment, joined the Nationwide Federal Credit Union. On December 19, 1978, Berringer borrowed $30,000.00 from the Credit Union and executed a promissory note for $49,973.60. Berringer borrowed another $7,200.00 from the Credit Union and executed a promissory note for $9,349.00 on July 13, 1979. On November 13, 1980, Berringer borrowed $7,500 from the Credit Union and executed a promissory note for $11,120.76. In connection with this third and final loan, Berringer also executed a document entitled "Payroll or Commission Deduction Authorization for Loan Repayment." This document authorized the Credit Union to make deductions from money owed Berringer to satisfy the debt evidenced by the November 13, 1980 promissory note. It provided that "[t]his authorization shall include also all wages, commissions, and any other moneys becoming due me upon, or at any time after, the termination of my AGENT'S AGREEMENT, but only to the extent of my indebtedness to the Credit Union." Berringer signed an Agent's Agreement with Nationwide on September 30, 1980.

Berringer resigned from his employment on July 6, 1982. At the time of his resignation, Berringer had accumulated extended earnings in the amount of $50,842.00. Berringer was also entitled to receive Deferred Compensation Income Credit, the value of which was dependent upon the date of receipt. If Berringer were to opt to receive the Deferred Compensation Income Credit upon resignation, it would have had a cash value of $17,239.98. If Berringer had waited until his sixtieth birthday, or December 1, 1990, he would have received $28,128.54.

Nationwide, however, refused to remit any of this money to Berringer at the time of his resignation. On September 10, 1982, Edwin M. Allegar, Nationwide's Regional Sales Manager, sent Berringer a letter in which he stated that Berringer "gave a voluntary *assignment* to the Credit Union for reimbursement of their monies, which has priority." (*See* Letter of September 10, 1982, Jt. Ex. 9) (emphasis added). Allegar's letter did not itemize the "monies" Berringer owed the Credit Union. Allegar also informed Berringer that he would not receive any money accrued as deferred compensation until those obligations were satisfied. (*Id.*).

On October 19, 1982, Robert Parsons, Associate Counsel of Nationwide, wrote Berringer a letter in which he explained that Nationwide had not forwarded Berringer's deferred compensation because "there [were] many parties interested in satisfying outstanding debts from [Berringer's] deferred compensation." (Joint Ex. 13). The Credit Union was one of the primary parties interested in Berringer's deferred compensation. When he resigned, Berringer owed $22,885.25 on the December 19, 1978 promissory note, $3,258.00 on the July 13, 1989 promissory note, and $6,362.98 on the November 13, 1980 promissory note. Berringer owed $1,823.51 on a Visa Card account issued by the Credit Union. Parsons' letter itemized Berringer's indebtedness as follows:

Regional Office Debt . . . . . . . . . $ 1,439.00
Nationwide Credit Union
 Loans . . . . . . . . . . . . . . . . . . . . . . 32,776.32
Internal Revenue Service
 Levy . . . . . . . . . . . . . . . . . . . . . . . 16,515.24
Nationwide Credit Union
 Visa . . . . . . . . . . . . . . . . . . . . . . . . 1,823.51
Heritage Securities . . . . . . . . . . . . 4,098.48
Total indebtedness . . . . . . . . . . . $56,652.46

Parsons informed Berringer that his total indebtedness ($56,652.46) exceeded the amount due Berringer as extended earnings ($50,842.00). The letter also noted that Berringer was entitled to Deferred Compensation Credits worth $28,128.54 at age 60, or as of December 1, 1990, but that this money was not immediately available to Berringer.

Parson's letter gave Berringer three options to satisfy his indebtedness. Parsons first suggested that Berringer could attempt to persuade one of his creditors to wait until December 1, 1990 for satisfaction and then use part of his Deferred Compensation Credit to satisfy the outstanding debt at that time. Second, Parsons informed Berringer that he could take the discounted dollar value of his Deferred Compensation Credit to satisfy the debts immediately and keep the remaining balance. Finally, Berringer could remit the $5,810.46 difference between his indebted-

ness and his extended earnings and collect the full value of the Deferred Compensation Credit on December 1, 1990. (Joint Ex. 13)

Berringer decided to take the present discounted cash value of his Deferred Compensation Credits to satisfy his indebtedness. At trial before Judge Markovitz, he testified that this was really his only option because he did not have the funds to satisfy the $5,810.46 difference between his extended earnings and his indebtedness at the time of his resignation (Tr. 17).[2] Judge Markovitz found that Nationwide fraudulently withheld an amount of Berringer's security compensation that was equivalent to his indebtedness on the three loans and his Visa account.[3] He therefore ordered Nationwide to remit $34,599.74 with interest.

### III. *Analysis*

This Court has jurisdiction to review the decision of the bankruptcy court. 28 U.S.C. § 158(a). The bankruptcy court's factual findings must be upheld unless those findings are clearly erroneous. *See* Bankr.Rule, 8013, 11 U.S.C.; *In re Morrisey,* 717 F.2d 100, 104 (3d Cir.1983). However, this Court's review of the bankruptcy court's legal conclusions is plenary. *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 38–39 (3d Cir.1989). For the reasons set forth below, the ruling of the bankruptcy court will be reversed.

In this appeal, Nationwide argues that the bankruptcy court erred in entering judgment in favor of Berringer for three reasons. Nationwide first renews its contention that the cause of action is time-barred. Next, Nationwide contends that Berringer failed to prove the elements of fraud. Finally, Nationwide argues that it was legally entitled to withhold Berringer's wages pursuant to the Agent's Agreement.

### A. Statute of Limitations

■ Nationwide's first argument on appeal is that the trustee's cause of action arises under the Agent's Agreement and is thus controlled by the contractual three year limitations period contained in that agreement. This argument is unpersuasive.

■ Nationwide's employment relationship with Berringer was governed by the agreement and it vested both parties with certain rights and obligations. The complaint does not, however, allege that Nationwide violated the Agent's Agreement. Rather, the complaint attempts to state a common law cause of action for fraudulent misrepresentation. The Agent's Agreement does purport to limit the parties rights and obligations that exist at common law. The cause of action, therefore, does not arise under the Agent's Agreement and is not subject to its contractual statute of limitations. Moreover, it is well settled that the plaintiff is master of his complaint and may choose specific theories of recovery to avail himself of a longer statute of limitations, provided that the plaintiff can demonstrate the elements of the cause of action and the prerequisites for jurisdiction. *Cf. Wheel Master, Inc. v. Jiffy Metal Products Co.,* 955 F.2d 1126 (7th Cir. 1992).[4]

---

**2.** "Tr." refers to the 142 page transcript of the trial held before Judge Markovitz on February 22, 1991.

**3.** The complaint sought $38,698.22 which included the $4,098.48 Berringer allegedly owed to Heritage Securities. Defendant's pretrial narrative indicated that Berringer and his wife executed an assignment in favor of Heritage on September 12, 1982 and that Nationwide acknowledged that assignment. The trustee did not pursue a claim for this money at trial. (*See* Tr. 52). Accordingly, that claim is not before this Court.

**4.** Nationwide argues that the trustee's cause of action cannot state a claim for fraudulent representation because the trustee failed to plead

fraud with the sufficient specificity required by Rule 9(b) of the Federal Rules of Civil Procedure. This argument is without merit as the complaint satisfies the requirements of Rule 9(b) as interpreted by the Third Circuit. *See Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 790–91 (3d Cir.1984). Paragraph six and seven of the complaint specifically set forth the activity that forms the basis of the fraud count. Moreover, Nationwide never brought a motion to dismiss the complaint nor filed a motion for a more definite statement. Accordingly, it waived its right to object to the complaint as failing to satisfy the specificity requirements of Rule 9. *See United National Records, Inc. v. MCA, Inc.,* 609 F.Supp. 33, 39 (N.D.Ill.1984).

Pennsylvania law provides a six year statute of limitations for fraud actions that accrued between June 27, 1979 and February 18, 1983. *See* 42 Pa.C.S.A. § 5527(6) (Purdon's Supp.1981); *A.J. Cunningham Packing Co. v. Congressional Financial Corp.*, 792 F.2d 330, 333–337 (3d Cir.1986). The statute begins to run "from the time the cause of action accrued." 42 Pa.C.S.A. § 5502(a) (Purdon 1981). Under Pennsylvania law, a cause of action accrues at "the occurrence of the final significant event necessary" to make the defendant's conduct actionable. *Ross v. Johns–Manville Corp.*, 766 F.2d 823, 826 (3d Cir.1985) *quoting Mack Trucks, Inc. v. Bendix–Westinghouse Automotive Six Brake Co.*, 372 F.2d 18, 20 (3d Cir.1966) *cert. denied*, 387 U.S. 930, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967).

The final significant event that, according to the trustee, would make Nationwide's conduct actionable, was the harm suffered by Berringer when he relied upon Nationwide's representation that he had assigned his compensation to the Credit Union. That harm, the trustee contends, occurred on December 6, 1982 when Nationwide remitted a check for the reduced amount of $34,599.76 to Berringer. The instant adversary action was filed on September 9, 1988, within the applicable six year limitation period.

### B. Fraudulent Misrepresentation

Nationwide also argues that the bankruptcy court erred by concluding that the trustee had proved fraud by clear and convincing evidence. The elements of fraud under Pennsylvania law are: (1) a misrepresentation; (2) fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a result. *Briggs v. Erie Ins. Group*,

406 Pa.Super. 560, 566, 594 A.2d 761, 764 (1991); *B.O. v. C.O.*, 404 Pa.Super. 127, 131, 590 A.2d 313, 315 (1991); *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 108, 464 A.2d 1243 (1983); *Mellon Bank v. First Union Real Estate*, 951 F.2d 1399, 1409 (3d Cir.1991).[5] At trial, the trustee argued that Berringer never assigned his right to security compensation to the Credit Union. The trustee contended that Allegar's letter of September 10, 1982 and Parson's letter of October 19, 1982 contained actionable misrepresentations of existing facts. In response, Nationwide asserted that Berringer gave the Credit Union an assignment as security for each of the loans.

The bankruptcy court concluded that the documents Berringer executed in connection with the November 1980 loan did not constitute a valid assignment and therefore concluded that Nationwide's assertion of a valid assignment was a false representation of an existing fact (125 B.R. at 449–50). The bankruptcy court further found that there was absolutely no evidence that Berringer had executed assignments to secure the 1978 and 1979 loans or to secure the Visa account. It thus found that Nationwide fraudulently withheld Berringer's deferred compensation and ordered Nationwide to return the money with interest (125 B.R. at 452).

On appeal, Nationwide renews its contention that Berringer executed assignments in favor of the Credit Union to secure the loans he took and that, consequently, Nationwide did not make any actionable misrepresentations. After reviewing the record and the applicable case law, I conclude that the bankruptcy court erred in finding that Nationwide fraudulently withheld Berringer's security compensation to satisfy his loan obligations.

First, the bankruptcy court erred by holding that the payroll deduction authorization form Berringer executed with the November

---

**5.** The bankruptcy court stated the elements of fraud in a slightly different, albeit correct, manner. (*See* 125 B.R. at 449–50). The bankruptcy court's statement explicitly required plaintiff to demonstrate *scienter*, which is shorthand for actual knowledge of the statement's falsity, reckless ignorance of its falsity, or unknowingly providing false information where circumstances impose a duty of knowledge on the speaker. (125 B.R. at 449). The Pennsylvania Superior Court recently explained that the second element of its formulation, which requires proof of "a fraudulent utterance" encompasses the intent or *scienter* required for an utterance to be considered fraudulent. *See B.O. v. C.O.*, 404 Pa.Super. at 132 n. 1, 590 A.2d, at 315 n. 1; *Brindle v. West Allegheny Hospital*, 406 Pa.Super. 572, 574, 594 A.2d 766, 768 (1991).

1980 loan was not an assignment. Second, after reviewing the record, I must conclude that the trustee failed to introduce sufficient evidence to demonstrate the falsity of Nationwide's statement that Berringer had given the credit union assignments to secure the 1978 and 1979 loans. I will first discuss the impact of the documents executed in connection with the November 1980 loan, and then consider the evidence regarding the 1978 and 1979 loans.

 Although there is a dearth of Pennsylvania cases that discuss assignments, some very general principles can be gleaned from the existing precedent. Pennsylvania law recognizes both legal and equitable assignments. *Brager v. Blum*, 49 B.R. 626, 629 (E.D.Pa.1985). A legal assignment is a transfer of property, a right or interest from one person, the assignor, to another, the assignee, *In re Purman's Estate*, 358 Pa. 187, 190, 56 A.2d 86, 88 (1948), which transfers the entire interest in the thing assigned unless it is qualified. *Id.* "To effect a legal assignment, the assignor must at the time of the assignment have a present intent to transfer or divest himself of his rights." *Brager v. Blum*, 49 B.R. at 629; *see also Melnick v. Pennsylvania Co. for Banking & Trusts*, 180 Pa.Super. 441, 119 A.2d 825, 826 (1956). In the event a party cannot demonstrate a legal assignment, he may rely upon the doctrine of equitable assignment. An equitable assignment is "any order, writing or act by the assignor which makes an absolute appropriation of a chose in action or fund to the use of the assignee with the intention to transfer a present interest . . . ." *In re Purman's Estate*, 56 A.2d at 88.

 An assignment made for valuable consideration is irrevocable. *Brager v. Blum*, 49 B.R. at 629. Although lack of consideration does not invalidate an assignment, an assignment unsupported by consideration is revocable unless a writing or delivery of an object evidences its irrevocability. *Id.* (citations omitted). Pennsylvania law will recognize a valid assignment if the assignor intentionally transferred a right to the assignee with the present intent to divest himself of his right and relinquishing all his claims or interest in favor of the assignee.

At trial, Nationwide introduced a document entitled "Payroll Commission Deduction Authorization For Loan Repayment Only," ("payroll deduction authorization") which was executed in connection with the November 13, 1980 loan for $7,500.00. (Jt. Ex. 23). That document provides, in pertinent part:

> I hereby authorize you to make a deduction from my commissions and other amounts due me as outlined below, and deposit same currently to the account of Nationwide Credit Union until further notice, or in any event not to exceed in the aggregate the sum of _____. This authorization•*shall include also all wages, commissions, and any other monies becoming due* upon me, or *at any time after, the termination of my AGENT'S AGREEMENT*, but only to the extent of my indebtedness to the Credit Union. (emphasis added).

(Jt.Ex. 23). The document further specified that Nationwide would remit $132.39 each month from Berringer's commissions directly to the Credit Union. (*Id.*)

The bankruptcy court concluded that this language did not divest Berringer of his right to receive deferred compensation. (125 B.R. at 450–51) It held that this language "merely 'authorized' Nationwide to 'make deductions' . . . and to remit those amounts to the Credit Union on his behalf . . . ," and therefore did not create an assignment. *Id.* I disagree.

By executing the document, Berringer relinquished his right to receive a stipulated sum of money otherwise due him each month in favor of the Credit Union. Accordingly, the document evidences Berringer's present intent to extinguish his right to the monthly sum and transfer that right to the Credit Union. *See* Restatement (Second) Contracts § 317(1); Calamari & Perillo, *Contracts*, p. 724–725 (3d Ed.1987).

The bankruptcy court concluded, however, that "Mr. Berringer never *intended* to divest himself of his right to the Security Compensation." (125 B.R. at 451) It found that the document was executed merely for Berringer's convenience because it eliminated the

need for Berringer to make the payments himself. (125 B.R. at 451)

The payroll deduction authorization form, however, specifically provided that upon the termination of Berringer's Agent's Agreement, Nationwide would deduct whatever funds were necessary from Berringer's "wages, commissions and any other monies becoming due" to satisfy his indebtedness to the Credit Union. This provision is clearly designed to protect the Credit Union's financial position rather than to serve Berringer's convenience. The effect of the document was to grant the Credit Union an interest in Berringer's deferred compensation that was equivalent to his indebtedness on the November 1980 note. I therefore conclude that the payroll deduction authorization was a valid assignment and effectively assigned the Credit Union an amount of Berringer's deferred compensation that was equivalent to his outstanding indebtedness on the November 1980 loan. Thus, Nationwide did not misrepresent its entitlement to recover money to satisfy Berringer's indebtedness on that note.

■ Nationwide was unable, however, to produce similar payroll deduction authorization documents for the 1978 and 1979 notes. Paula Edwards, the President and General Manager of the Credit Union, testified that the payroll deduction authorizations were kept for seven years and loan documents were destroyed two years after the debt was satisfied. (Tr. 54, 56) The payroll authorization deduction forms for the 1978 and 1979 loans had already been destroyed when the bankruptcy trustee filed suit against Nationwide. The bankruptcy court therefore found that there was no evidence that Berringer had executed assignments to secure these notes. The bankruptcy court's analysis improperly placed the burden of persuasion on Nationwide.

■ Berringer's cause of action for fraud was based on his contention that Nationwide had falsely represented the legal status of the Credit Union's interest in his security compensation. It was thus incumbent upon Berringer to prove the falsity of Nationwide's statement by "evidence that is clear, precise and convincing." *Snell v. State*

*Examining Board,* 490 Pa. 277, 281, 416 A.2d 468, 470 (1980); *Delahanty v. Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 108, 464 A.2d 1243, 1252 (1983); *Mellon Bank Corp. v. First Union Real Estate,* 951 F.2d 1399, 1409 (3d Cir.1991). This is a higher standard than the preponderance standard required in most civil cases. *Beardshall v. Minuteman Press International, Inc.,* 664 F.2d 23, 26 (3d Cir. 1981). The law requires a higher standard of proof because a finding of fraud can overturn settled issues of law. *B.O. v. C.O.,* 404 Pa.Super. at 131, 590 A.2d at 315.

■ To satisfy this higher burden of proof, the "witnesses must be credible, must distinctly remember the facts to which they testify, [and] must narrate the details exactly ..." *Laughlin v. McConnel,* 201 Pa.Super. 180, 191 A.2d 921, 923 (1963); *accord Delahanty,* 318 Pa.Super. at 110, 464 A.2d at 1253; *Edelstein v. Carole House Apartments, Inc.,* 220 Pa.Super. 298, 286 A.2d 658, 661 (1971). Moreover, the witnesses' testimony must be "so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction without hesitancy, of the truth of the precise facts at issue." *Delahanty,* 318 Pa.Super. at 110, 464 A.2d at 1253. Although fraud can be established by the uncorroborated testimony of a single witness, *id.,* the uncorroborated testimony of a single witness which is diametrically opposed by another witness cannot be considered evidence of such weight to prove fraud by clear, convincing and precise evidence. *Laughlin,* 201 Pa.Super. at 182, 191 A.2d at 923.

Berringer has not produced sufficient evidence to prove that Allegar's representation that Berringer has given the Credit Union an assignment to secure the 1978 and 1979 loans was in fact a misrepresentation. The only evidence that supported Berringer's claim that he had not assigned his right to his deferred compensation to the Credit Union was his own testimony. Although the uncorroborated testimony of a single witness may be sufficient to prove fraud if the witness is credible and clearly and precisely remembers and explains the allegedly fraudulent statements, Berringer's testimony was far from a model of clarity.

Berringer testified that he did not "recall" signing any document that assigned his rights to wages and deferred compensation to the Credit Union. (Tr. 20–21). In fact, when confronted with the executed assignment for the November 1980 loan, Berringer acknowledged that the signature was his, but testified that he did not recall signing the authorization. (Tr. 28). He did, however, remember signing promissory notes in connection with the loans. (Tr. 22). He testified that he was aware that Nationwide automatically deducted a specified amount of money from his paycheck and forwarded that money to the Credit Union to repay the loans. (Tr. 24). Berringer further testified that he believed that the authorization for this automatic deduction was contained in the note itself. (*Id.*).

Berringer's testimony was thus confused at best. He never affirmatively denied executing assignments in connection with the 1978 and 1979 loans. He thus failed "to distinctly remember the fact to which [he] testif[ied] ... [and to] ... narrate the details exactly." *Delahanty* 318 Pa.Super. at 110, 464 A.2d at 1253. His testimony was neither clear, precise nor convincing and thus could not enable the trier of fact to "come to a clear conviction without hesitancy, of the truth of the precise facts in issue." *Id.*

Moreover, there was clear testimony from Paula Edwards that the Credit Union required assignments to secure loans as a matter of course. (Tr. 52–53). Edwards further testified that microfilm records indicated that the Credit Union sent Berringer quarterly statements that reflected that the Credit Union automatically received deductions from Berringer's paychecks to satisfy the three loans. (Tr. 65, Defendant's Ex. L). Thus, the uncontradicted evidence at trial demonstrated that Nationwide forwarded a monthly payment to the Credit Union for each of the three loans. These microfilm records and Berringer's admission that he knew deductions were taken for all three loans strongly suggest that Berringer executed payroll deduction authorization forms in connection with the 1978 and 1979 loans.

■ In its memorandum opinion, the bankruptcy court placed great weight on the Credit Union's inability to produce payroll deduction authorization forms for the 1978 and 1979 notes. It expressed great skepticism about the Credit Union's practice of destroying the payroll deduction authorization after seven years. In fact, its conclusion that an assignment never existed seems to be based, at least in part, on the dubious nature of such a practice. (125 B.R. at 450). Although it may be careless practice for a lender to destroy documents evidencing an assignment made to secure a loan before the borrower has satisfied the obligation, that is not what happened in the instant case.

Edwards testified that all borrowers executed payroll deduction authorization forms which were attached to vouchers. (Tr. 52). The Credit Union kept those forms for seven years. (Tr. 54). However, the loan documents themselves were kept for two years after the loan obligation was satisfied. (Tr. 56–57). Although the Credit Union destroyed the documentation for the 1978 and 1979 loans before the adversary proceeding, that is because Berringer's obligations on those notes were satisfied in late 1982 when his deferred compensation was disbursed. Thus, the Credit Union did not destroy the documents until after the loan debts were satisfied, as was its custom. No negative inference can be drawn from this practice.

The bankruptcy court's conclusion that there was sufficient evidence to demonstrate a false representation with regard to the 1978 and 1979 notes was error.

■ The Visa account presents an entirely different issue, however. The trustee claims that Nationwide fraudulently represented that Berringer had given the Credit Union an assignment to secure the Visa account. In fact, Edwards own testimony demonstrated that the Credit Union never received any payroll deduction authorization or assignment to secure the Visa account. (Tr. 64–65, 79). This means that Allegar's letter of September 10, 1982, indicating that Berringer had given "a voluntary assignment to the Credit Union for reimbursement of their monies, which has priority," plainly misrepresented the facts.

It is not enough, however, for the trustee merely to prove a false representation. As noted *supra*, the maker must intend that the recipient be induced to act upon it. It is here that the trustee fails.

The instant matter is anything but a classic fraud in the inducement case. It arises out of a pre-existing dispute over withheld funds. Nationwide already held the monies to which Berringer believed he was entitled, but to which the company claimed a right of assignment. No act or omission on Berringer's part was required to place these funds in Nationwide's possession. It is entirely unclear then, both from the trustee's brief and from the record, how Nationwide intended Berringer to act upon receipt of a misrepresentation which was no more than an explanation—albeit a factually and legally erroneous one—of why the company was retaining its former employee's deferred compensation. What action was Nationwide seeking to induce?

Berringer sought payment of his deferred compensation and Nationwide disputed his claim. Berringer was then left with two choices: initiate legal action, or do nothing. If anything, it is more reasonable to conclude that Nationwide would have expected its former employee to pursue a claim for such a substantial sum, not that he would simply have acquiesced to its legal position as stated through Messrs. Allegar and Parsons.

All of this is not to say that Nationwide rightfully retained the $1,823.51 owing on the Visa account. Edwards testified that the Visa account was similar to all such accounts. (Tr. 65). This means that, unlike the promissory notes that secured the loans, there was no acceleration clause calling for full satisfaction of the account balance in the event Berringer terminated his employment with Nationwide. (Jt.Ex. 20, 21, 22). Berringer was under no obligation to satisfy the debt on his Visa account at the time of his resignation.

Nevertheless, rather than sue in conversion, breach of contract or similar theory, Berringer chose to acquiesce in Nationwide's statement of its claims and right to assignment. That does not now provide the trustee with a cause of action in common law fraud where, as here, he has failed to meet the exacting standard of proving by clear and convincing evidence that Nationwide intended, by false statement, to induce Berringer to act.

An appropriate order will follow.

### *ORDER*

AND NOW, this 1st day of July, 1992, it is hereby

ORDERED, that the bankruptcy court's order that Nationwide remit $32,776.32 or the amount it withheld to satisfy Berringer's obligation on the 1978, 1979 and 1980 loans is REVERSED and VACATED. It is further

ORDERED, that the bankruptcy court's order that Nationwide remit the $1,823.51 with interest to Berringer is REVERSED and VACATED. The Clerk shall mark this matter CLOSED.