**PRIME BUILDING CORPORATION,**
Plaintiff,

v.

**ITRON, INC., Defendant.**

**Civil Action No. 98–2387.**

United States District Court,
E.D. Pennsylvania.

Oct. 9, 1998.

Robert T. Vance, Jr., Philadelphia, PA, for Plaintiff.

Joseph P. Dever, Jr., Michael R. Libor, Morgan, Lewis & Bockius, Philadelphia, PA, for Defendant.

## MEMORANDUM AND ORDER

KATZ, District Judge.

Plaintiff Prime Building Corporation (Prime) commenced this action by filing a four count complaint against defendant Itron, Inc (Itron). Itron now moves for summary judgment on liability for all four counts and alternatively requests summary judgment on various damages issues. Because there are genuine issues of material fact on all four counts, the summary judgment motion on liability will be denied. As those factual disputes also affect the calculation of damages, Itron's motion for summary judgment on damages will also be denied.

*Factual Background*

On May 6, 1996, Itron's Senior Implementation Project Manager, Joe Ruggeri, and Prime's President, Ed Pridgen, attended a vendors' conference held by the City of Philadelphia to explain aspects of its Request for Proposal to all contractors interested in submitting bids for an Automatic Meter Reading (AMR) project. At the meeting, the City specifically requested subcontract participation by Disadvantaged Business Enterprises (DBEs). Prime is a certified disabled DBE.

Following the meeting, Ruggeri spoke with Pridgen and told him that Itron was interested in submitting a bid and wanted to discuss Prime's participation in the project. On May 15, 1996, Prime sent Itron a two page bid proposal for the administrative and customer service portion of the AMR project. Following discussion of the proposal, on approximately June 28, Itron submitted to the City a proposal that listed Prime as the Disabled–DBE subcontractor for "construction man-

agement, field installation, [and] administrative support installing." See Def.'s App. Ex. H. The City's form includes an explicit statement that listing a minority subcontractor in this position is a commitment to that firm by the primary bidder, although there are provisions by which the primary contractor can request a change of subcontractors. See Def.'s Ex. G at 7, 5. Itron submitted the Commitment form to the Minority Business Enterprise Council (MBEC) on April 29, 1997, although it attempted to reserve the right to add or replace DBE subcontractors as necessary. See Pl.'s App. Ex. 11.

On June 4, 1997, Itron called a meeting for subcontractors to discuss a new Statement of Work. The significance of this meeting is hotly disputed. Prime contends that Pridgen (its president) and the other Prime attendees had no idea Prime was in competition with the other subcontractors; Itron argues that Prime must have known that it faced competition given the presence of other subcontractors to whom Prime was introduced. According to Prime, however, following the meeting, Pridgen and Daniel O'Connell, Prime's Senior Project Manager, sought assurances that Itron was still committed to Prime. O'Connell and Pridgen both claim that Thomas Shenyey, Itron's AMR Project Manager, told them that they did not face competition for the work. See Def.'s Ex. B at 64–67; Def.'s Ex. C at 59, 60. Shenyey denies having said or implied that Prime faced no competition. See Def.'s Ex. D at 72–73.

Subsequently, on July 10, 1997, Itron executed the AMR contract with the city, stating that Prime would be utilized as a contract participant. See Pl.'s App Ex. 22. However, on August 1, 1997, Pridgen and O'Connell met with Itron representatives Graham and Shenyey, at which point Prime was informed that the administrative and customer services portion of the contract had been awarded to another group, VSI.[1] On August 4,

---

**1.** There is substantial dispute regarding the relationship between Prime and VSI and the degree to which Prime communicated with VSI regarding potential joint venture opportunities. Prime's president admits in deposition testimony that Tom Shenyey of Itron had suggested that

Prime consider a joint venture with VSI and potentially another company regarding the customer service work, and he also admits to knowing that VSI wished to submit a bid for the customer service portion. He continues to maintain, however, that he was still under the impres-

1997, Prime informed Itron of its intention to initiate legal action; soon thereafter, Itron requested that the MBEC permit Itron to reduce Prime's percentage participation in the AMR project. The MBEC rejected this request and convened a meeting with Prime, Itron, and City representatives to attempt to resolve the matter.

At this meeting, Itron listed four remaining work projects for which it did not have subcontractors. Prime contends that this meeting established that Prime was to perform warehousing and tenant build-out construction for Itron; Itron denies that there was any agreement that Prime would definitely perform the warehousing services. Although a contract was negotiated and signed regarding the tenant build-out construction, after receiving a proposal from Prime regarding the warehousing portion, Itron informed the MBEC that it intended to perform this work in-house. Prime alleges that it was unaware of Itron's decision until December 2, 1997.[2] On December 5, 1997, Itron sent Prime a letter directly informing it that Itron would perform the warehouse work in-house. *See* Pl.'s App. Ex. 35. On January 8, 1998, the MBEC approved Itron's second request for a reduction in Prime's participation. *See* Pl.'s App. Ex. 36.

There is also dispute regarding the contract that was actually signed between Prime and Itron for the tenant build-out work. On March 12, 1998, Prime received notice that it was being fined $4,310 for beginning construction without the required permits. Al-though the contract between Prime and Itron clearly states that Prime is to be responsible for acquiring needed permits, *see* Compl. Ex. B. art. II; *id.* Ex. A, Prime sent a letter to Itron on March 25, 1998, saying that Prime would not accept responsibility for the fines because Itron's failure to secure drawings had resulted in the denial of the permits. *See* Pl.'s App. Ex. 38. Itron denied at the time that it had any liability, stating that Prime had undertaken to secure the proper drawings. *See* Pl.'s App. Ex. 39.

Based on these disputes, Prime brings this four-count suit against Itron. Count II alleges that Itron initially breached the agreement by which it committed to using Prime as the subcontractor for the administrative and customer service work. Count I alleges that Itron breached a subsequent agreement between the two companies by which Prime would perform warehousing support work. Prime claims in Count III that Itron fraudulently induced Prime to incur personnel costs in preparing its bid proposals for the aforementioned work projects; it states that Itron never intended to work with Prime but used them only to comply with the DBE requirements. Finally, Count IV alleges that Itron breached its duty to obtain permits in connection with construction fit-out work that Prime actually performed pursuant to the September 8, 1997 contract.

*Discussion* [3]

■ In response to Itron's Motion for Summary Judgment, Prime has demon-

---

sion that Itron would work with Prime on the customer service portion. *See* Def.'s Ex. B. at 52–60.

**2.** It should be noted that, almost simultaneously with Itron's decision to perform the work internally (the letter to the MBEC was sent on October 22, 1997), Prime states that it requested that Itron contact it to negotiate regarding the warehousing proposal. Prime was copied on the letter Itron sent to the MBEC on October 22, but Prime argues that its own letters to Itron indicate that Prime was unaware of Itron's decision. *See, e.g.,* Pl.'s Ex. 32, 34. Itron disputes this conclusion.

**3.** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn therefrom in favor of the non-moving party. *See Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987); *Baker v. Lukens Steel Co.,* 793 F.2d 509, 511 (3d Cir.1986). In other words, if the evidence presented by the parties conflicts, the court must accept as true the allegations of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When the movant does not have the burden of proof on the underlying claim or claims, that

strated the existence of a genuine issue of material fact with respect to each count. Consequently, the defendant's motion will be denied.

*Liability Issues*

*Count II: Breach of the Initial Agreement*

■ Itron argues that summary judgment is appropriate on Count II because there was never a contract for Prime to perform the administrative-customer service work for the AMR Project. It contends that neither the submission of a subcontracting bid by Prime nor Itron's inclusion of that bid in its proposal to the City and the later listing of Prime on the Commitment form create an obligation.

■ The defendant correctly states that, in most cases, the submission of a bid for a subcontract is merely an offer that is not accepted until a written contract specifying terms is entered into by the general contractor and the subcontractor. *See, e.g., Project Dev. Group v. O.H. Materials Corp.,* 766 F.Supp. 1348, 1352 (W.D.Pa.1991), *aff'd* 933 F.2d 225 (4th Cir.1993). The plaintiff concedes this point. However, even the cases cited by the defendant acknowledge that contracts may be formed other than by a written agreement. *See id.* (suggesting that in some situations an oral contract may be formed between contractors and subcontractors). The Pennsylvania Supreme Court has stated that "in the case of a disputed oral contract, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact...." *Johnston the Florist, Inc. v. TEDCO Const. Corp.,* 657 A.2d 511, 516, 441 Pa.Super. 281, 291 (1995).

In this case, there are factual disputes regarding what was said, what was done, and the intentions of each party. Even a legal determination of the significance of the City commitment form and bid proposal hinges on factual disputes, such as the degree to which Itron and Prime communicated prior to the award of the City contract to Itron. As an initial matter, there are factual disputes regarding the degree and nature of contact between Itron and Prime prior to the subcontractor's meeting in June, 1997, particularly regarding the representations made by Itron to Prime. . Additionally, there is no consensus on the degree to which Itron led Prime to believe that it was the only company being considered for the administrative and customer services work. Prime contends that it received numerous verbal assurances from Itron, in particular from Joe Ruggeri, regarding its participation prior to the meeting with the other vendors in June 1997, and it alleges that these oral assurances combined with the commitment of the written forms to the city created a binding obligation. Itron contends that it never made any firm commitment to Prime and merely treated Prime as any other potential subcontractor; it stresses that it attempted to reserve its right to change subcontractors from its first contacts with the MBEC.

Perhaps the most obvious example of the factual disputes in this case is the relationship between Prime and Itron following the June 4 subcontractor meeting. While Itron contends that Prime could not have believed that it was the only subcontractor being considered for the administrative and customer services contract following this meeting with numerous other vendors, Prime states that, precisely because of concerns for its status following this meeting, it asked for and received assurances from Itron's Tom Shenyey that Prime was still the only contender for that position. On this point, the deposition testimony is in direct conflict. Pridgen claims that Shenyey stated that " '[w]e're committed to working with Prime on this project and on this task.' " Def.'s Ex. B at 65. He states that this response was given to direct questions regarding whether or not

movant has no obligation to produce evidence negating its opponent's case, but must merely point to the lack of any evidence supporting the non-movant's claim. When the party moving for summary judgment is the party with the burden of proof at trial, and the motion fails to establish

the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented. *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir.1992).

others were bidding. *Id.* at 67.[4] Although he concedes at a later point that Mr. Shenyey never made an explicit statement that no other vendor was bidding, Pridgen is very forceful in his statement that Mr. Shenyey reassured Prime that no one else was being considered for the customer service position. *See id.* at 106–07. Mr. O'Connell agrees with Mr. Pridgen's description of events. He states in deposition testimony that he asked "who was our competition to provide customer and administrative support." *See* Def.'s Ex. C. at 60. He testifies that Tom Shenyey stated that no one was competing with them. *See id.* at 60.[5] Mr. Shenyey, in turn, denies ever having made assurances sufficiently firm that Prime could reasonably have relied upon them to believe that it faced no competition. *See* Def.'s Ex. at 72–73.

In short, there are factual disputes regarding whether there was an objective manifestation of each parties' intention to contract on this matter. These disputes are not appropriately resolved at the summary judgment stage, particularly given the importance of credibility findings.

*Count I: The August 29, 1997 "Agreement" Regarding Warehousing*

Prime's claim in Count I is similar in that Prime must demonstrate the existence of a contract or agreement between Prime and Itron that obligated Itron to have Prime perform the warehousing support work for the AMR project. Itron again argues that summary judgment is appropriate because there is no contract and maintains that the meeting between Itron, Prime, and the MBEC merely established that Prime would be permitted to bid for certain remaining projects. Prime, in contrast, argues that the agreement reached between Prime, Itron, and the MBEC required Itron to permit Prime to perform warehousing services. *See* Def.'s Ex. C at 114–16, 117–18; *id.* at Ex. B. at 143. Pridgen specifically alleges that that agreement was "a verbal agreement that was

made with numerous representatives, and it was also a letter from MBEC, Mr. Jim Roundtree, of which we were copied in on as a result of that meeting." *Id.* at 117. Prime's Complaint and summary judgment response include that letter from James Roundtree, the Deputy Finance Director of the MBEC, which is indeed copied to both Itron and Prime. In this letter to Councilman Nutter discussing the settlement meeting, Mr. Roundtree stated that "at this point, we feel that the situation has been resolved and that Mr. Pridgen (Prime Builders), will perform some services on the Automatic Meter Reading (AMR) project. Prime Builders will perform construction services, tenant fitout work, as well as some warehousing activity." *See* Compl. Ex. A. In contrast, Itron contends that the meeting led to merely an agreement that it would consider Prime's bid submission for the warehousing project, not that it would unconditionally agree to accept Prime's participation in the project. Its representatives testify in depositions that they never understood themselves to be making any such warehousing agreement. *See, e.g.,* Def.'s Ex. A at 49–50.

*Count III: Fraudulent Inducement*

█ The third count of the Complaint alleges that Itron fraudulently induced Prime to incur personnel costs in the preparation of proposals for the phone center operations and warehouse support operations portions of the project. Specifically, Prime suggests that Itron never intended that Prime would perform any portion of the contract and that Prime was used solely to fulfill DBE obligations.

██ Pennsylvania law requires a plaintiff alleging fraud to demonstrate the following elements by clear and convincing evidence: 1) a misrepresentation; 2) a fraudulent utterance of that misrepresentation; 3) intent by the utterer that the re-

---

4. "[W]e asked the question, were we the only ones submitting a bid? We asked that question. Tom Shenyey made it very clear to us that we were the only one that he was committed to working within the administrative/customer service portion. He made it very clear to me." *Id.*

5. "Q. And what was Tom Shenyey's answer?
A. No one, that they were committed to working with Prime on this project.
Q. Did Tom Shenyey, in fact, say "no one"?
A. Yes."
*Id.*

cipient be induced thereby to act; 4) the recipient's justifiable reliance on the misrepresentation; and 5) damage to the recipient proximately caused by that justifiable reliance. *See Trans Penn Wax Corp. v. McCandless,* 50 F.3d 217, 232 (3d Cir. 1995); *Sevin v. Kelshaw,* 611 A.2d 1232, 1236, 417 Pa.Super. 1, 9 (1992). The Pennsylvania courts have directed us to take a broad view of fraud, noting that it can be "anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Delahanty v. First Penn. Bank,* 464 A.2d 1243, 1251, 318 Pa.Super. 90, 107 (1983). The misrepresentation need not be in the form of a positive assertion. *See id., citing Shane v. Hoffmann,* 324 A.2d 532, 227 Pa.Super. 176 (1974).

All of the previously discussed factual disputes are essential to the question of whether there was any deception or intent to deceive that could be found by a trier at fact because Prime's fraud allegations hinge on factual issues; specifically, the trier of fact must evaluate the various witnesses' credibility and resolve contested claims to determine whether Prime could have reasonably believed that Itron had made a commitment to Prime and only to Prime. Prime itself makes this point in deposition testimony. Pridgen repeatedly states that Itron had generally led him to believe that Itron was committed to working with Prime on the customer service portion of the contract. *See, e.g.,* Def.'s Ex. B. at 168–73.[6] Itron again reiterates that it gave no firm assurances to Prime regarding its role in the venture. Thus, the resolution of the facts described previously also bear strongly upon this fraud claim.

### Count IV: The Costs of the Permits

■ The defendant also moves for summary judgment on Count IV, in which Prime seeks damages in connection with a fine imposed on it by the Philadelphia Department of Licenses and Inspections for starting work on the fit-out project prior to obtaining building permits. Prime alleges that Itron's omissions and actions led to a failure to obtain the necessary permits, *see* Compl. Count IV ¶ 37, and that "Itron owed a duty to Prime to perform all acts necessary to ensure that the requisite permits were secured prior to the commencement of work." *Id.* ¶ 38. In his deposition testimony, Pridgen states that the reason that Prime was unable to acquire the building permits was that Itron had failed to prepare architectural drawings that would have permitted Prime to receive the required permits. *See* Def.'s Ex. B at 194–96; Def.'s Ex. C. at 133 on. This claim is also found in a letter of October 27, 1997, in which Pridgen attributes Prime's lack of progress to Itron's initial failure to provide drawings, a failure that Pridgen seems to contend forced Prime to take over the matter itself. In contrast, Itron argues that Prime was under obligation to acquire the drawings and stresses that the terms of the contract required Prime to do so. *See, e.g.,* Pl.'s App. Ex. 39.

In sum, each count has at least one material issue of fact that is disputed and that is essential to a finding of liability. Summary judgment regarding liability is thus inappropriate, and Itron's motion will be accordingly denied.

### Damages

■ Itron alternatively requests summary judgment on the issue of damages. Specifically, it requests judgment on the issues of 1) whether Prime may recover its total bid costs for the warehousing proposal; 2) whether Prime may recover personnel costs for preparing bid proposals for both the administrative and customer service work and the warehousing work; 3) whether Prime may recover lost overhead regarding the same; 4) whether Prime may recover lost profits on the warehousing work and the administrative and customer service work; 5)

---

**6.** For example, Mr. Pridgen states:

They were committed to working with me on the customer service/administrative portion. Mr. Shenyey made many statements in reference to—that we were the only contractor that was bidding on the customer service/administrative portion, and just to lead me down the road to not even negotiate with us, is a false statement.

*Id.* at 169.

whether Prime may receive punitive damages regarding the fraud count; and 6) whether Prime may recover the fine costs regarding the permits it did not acquire. As the facts pertaining to these claims require resolution, these motions will be similarly denied. The one exception is argument six: whether Prime may recover the costs of the fine. As Itron points out in its motion for summary judgment, Mr. Pridgen concedes that he only paid half of the costs of the fine from the City, yet, Prime's complaint requests recovery of the full fine amount. Prime does not dispute Itron's portrayal of this fact, and thus the defendant's motion will be granted with respect to the full payment of the fine.

An appropriate order follows.

### *ORDER*

And now, this day of October, 1998, upon consideration of Defendant's Motion for Summary Judgment on Liability and Defendant's Motion for Summary Judgment on Damages and Plaintiff's responses thereto, it is hereby **ORDERED** as follows:

1. Defendant's Motion for Summary Judgment on Liability is **DENIED** as the court finds that there are genuine issues of material fact.

2. Defendant's Motion for Summary Judgment on Damages is **GRANTED** with respect to the full fine amount claimed in Count 4 of the Complaint. In the event of recovery, the plaintiff may not recover more money than it actually paid to the City of Philadelphia. Defendant's Motion is **DENIED** in all other respects.